No. 25-4613

# United States Court of Appeals for the Ninth Circuit

CURTIS McWASHINGTON; EDWARD M. MESHURIS; EMILY SANCHEZ; JAMES ALBRIGHT; CORY R. CROUCHLEY, individually as participants in the Nordstrom 401(k) Plan and as representatives of all persons similarly situated,

*Plaintiffs-Appellants,*

– v. –

NORDSTROM, INC.; BOARD OF DIRECTORS OF NORDSTROM, INC.; NORDSTROM 401K PLAN RETIREMENT COMMITTEE,

*Defendants-Appellees.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON

## OPENING BRIEF FOR PLAINTIFFS-APPELLANTS

TODD M. SCHNEIDER
JAMES A. BLOOM
SCHNEIDER WALLACE COTTRELL KIM LLP
2000 Powell Street, Suite 1400
Emeryville, California 94608
(415) 421-7100

PAUL M. SECUNDA
WALCHESKE & LUZI, LLC
235 North Executive Drive,
   Suite 240
Brookfield, Wisconsin 53005
(262) 780-1953

*Attorneys for Plaintiffs-Appellants*

CP COUNSEL PRESS   (800) 4-APPEAL • (624854)

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................. iii

INTRODUCTION ............................................................................ 1

JURISDICTIONAL STATEMENT ...................................................... 3

ISSUES PRESENTED ....................................................................... 4

STATEMENT OF FACTS .................................................................. 5

    I.      BUNDLED RKA FEES ............................................................ 5

    II.     MANAGED ACCOUNT FEES ................................................ 7

    III.    FORFEITURES ...................................................................... 8

STATEMENT OF THE CASE ........................................................... 12

SUMMARY OF ARGUMENT .......................................................... 15

ARGUMENT ................................................................................... 18

    I.      APPELLANTS' BREACH OF FIDUCIARY DUTY
          CLAIMS REGARDING EXCESSIVE RKA FEES
          ARE PLAUSIBLE ................................................................ 18

          A.    ERISA Fiduciaries Have an Ongoing Duty to Ensure
               Plan Expenses are Reasonable ................................... 18

          B.    Appellants' RKA Allegations Were Not Inconsistent
               and the Comparator Plans Were Not Dissimilar ....... 20

          C.    The District Court Erred by Holding that Plaintiffs'
               Well-Pled Apples-to-Apples Comparisons to Other
               Very Large 401(k) Plans with the Same Bundled RKA
               Services Are Insufficient to State a Claim for Relief .............. 28

    II.     APPELLANTS' BREACH OF FIDUCIARY DUTY
          CLAIM REGARDING EXCESSIVE MANAGED
          ACCOUNTS FEES IS PLAUSIBLE ...................................... 34

    III.    APPELLANTS' BREACH OF FIDUCIARY DUTY
          CLAIMS REGARDING MISALLOCATION OF
          PLAN FORFEITURES ARE PLAUSIBLE ............................. 38

i

A.     The Plan Committee Was Clearly Acting in a
       Fiduciary, Not Settlor Capacity, In Deciding How to
       Allocate Section § 8.2 Plan Forfeitures, the Only
       Forfeitures Challenged in the FAC ............................................39

B.     The District Court Erred by Concluding that
       Appellants' Well-Pled Allegations Are Implausibly
       Broad Like Those in *Hutchins I* and Similar Cases ..................43

IV.    APPELLANTS' BREACH OF FIDUCIARY
       PROHIBITED TRANSACTION CLAIMS
       REGARDING MISALLOCATION OF PLAN
       FORFEITURES ARE PLAUSIBLE ......................................... 54

V.     NORDSTROM DERIVATIVELY VIOLATED ITS DUTY
       TO MONITOR ..................................................................................57

CONCLUSION ....................................................................................58

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Abraham v. Exxon Corp.*,
  85 F.3d 1126 (5th Cir. 1996) ..............................................................47

*Albert v. Oshkosh Corp.*,
  47 F.4th 570 (7th Cir. 2022) ...............................................................30

*Bafford v. Northrop Grumman Corp.*,
  994 F.3d 1020 (9th Cir. 2021) ............................................................18

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)......................................................................23, 24

*Bos v. Bd. of Trs.*,
  795 F.3d 1006 (9th Cir. 2015) ..............................................................8

*Bracalente v. Cisco Systems*,
  2023 WL 5184138 (N.D. Cal. Aug. 11, 2023) ........................... 57-58

*Braden v. Wal-Mart Stores, Inc.*,
  588 F.3d 585 (8th Cir. 2009) ..............................................29, 31, 37

*Buescher v. North American Lighting, Inc.*,
  -- F.Supp.3d ----, 2025 WL 1927503 (C.D. Ill. June 30, 2025) ...............*passim*

*Cline v. Indus. Maint. Eng'g & Cont. Co.*,
  200 F.3d 1223 (9th Cir. 2000) ..............................................................8

*Concha v. London*,
  62 F.3d 1493 (9th Cir. 1995) ..............................................................20

*Dimou v. Thermo Fisher Sci. Inc.*,
  No. 23-CV-1732, 2024 WL 4508450 (S.D. Cal. Sept. 19, 2024) .............*passim*

*Dionicio v. U.S. Bancorp*,
  No. 23-CV-0026 (PJS/DLM),
  2024 WL 1216519 (D. Minn. Mar. 21, 2024) ......................25, 27, 33

*Dougherty v. City of Covina*,
  654 F.3d 892 (9th Cir. 2011) ..............................................................18

*Edes v. Verizon Communications, Inc.*,
  417 F.3d 133 (1st Cir. 2005)...............................................................46

*Fifth Third Bancorp v. Dudenhoeffer*,
573 U.S. 409 (2014) ................................................................19, 43, 50, 53

*Foltz v. U.S. News & World Report, Inc.*,
865 F.2d 364 (D.C. Cir. 1989) ................................................................50

*Friend v. Sanwa Bank Cal.*,
35 F.3d 466 (9th Cir. 1994) ................................................................55

*Howard v. Shay*,
100 F.3d 1484 (9th Cir. 1996) ................................................................19

*Hughes Aircraft Co. v. Jacobson*,
525 U.S. 432 (1999) ................................................................39

*Hughes v. Nw. Univ. ("Hughes II")*,
63 F.4th 615 (7th Cir. 2023), *appeal pending*, No. 25-826 (9th Cir.) .........*passim*

*Hutchins v. HP Inc. ("Hutchins I")*,
737 F. Supp. 3d 851 (N.D. Cal. 2024) ........................................................*passim*

*Hutchins v. HP Inc. ("Hutchins II")*,
2025 WL 404594 (N.D. Cal. Feb. 5, 2025),
*appeal pending*, No. 25-826 (9th Cir.) ................................................................43, 44, 54

*John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank*,
510 U.S. 86 (1993) ................................................................40

*Johnson v. Fujitsu Tech. & Bus. of Am., Inc.*,
250 F. Supp. 3d 460 (N.D. Cal. 2017) ................................................................29

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018) ................................................................32, 33, 37

*Knievel v. ESPN*,
393 F.3d 1068 (9th Cir. 2005) ................................................................37

*Krutchen v. Ricoh USA, Inc.*,
2024 WL 3518308 (3d Cir. July 24, 2024)................................................................26, 30

*Liao v. Fisher Asset Mgmt., LLC*,
No. 24-cv-2036, 2024 WL 4351869 (N.D. Cal. Sept. 30, 2024) ......................48

*Lockheed Corp. v. Spink*,
517 U.S. 882 (1996)................................................................54, 55

iv

*Marshall v. Snyder*,
572 F.2d 894 (2d Cir. 1978) ............................................................... 19

*Matney v. Barrick Gold of N. Am.,*
80 F.4th 1136 (10th Cir. 2023) ........................................................... 31

*Mator v. Wesco Distribution*,
102 F.4th 172 (3d Cir. 2024) .....................................................*passim*

*Matousek v. MidAmerican Energy Co.*,
51 F.4th 274 (8th Cir. 2022) ................................................20, 29, 31

*McMaken v. GreatBanc Tr. Co.*,
2019 WL 1468157 (N.D. Ill. Apr. 3, 2019) ................................ 54-55

*McManus v. Clorox Co. ("McManus I")*,
2024 WL 4944363 (N.D. Cal. Nov. 1, 2024) ..................................... 44

*McManus v. Clorox Co. ("McManus II")*,
2025 WL 732087 (N.D. Cal. Mar. 3, 2025) ...................................*passim*

*Meiners v. Wells Fargo & Co.*,
898 F.3d 820 (8th Cir. 2018) ............................................................. 20

*Nagy v. CEP Am., LLC*,
2024 WL 2808648 (N.D. Cal. May 30, 2024) .................................... 29

*Naylor v. BAE Sys., Inc.*,
2024 WL 4112322 (E.D. Va. Sept. 5, 2024) .........................11, 40, 41

*Patelco Credit Union v. Sahni*,
262 F.3d 897 (9th Cir. 2001) ............................................................. 55

*Pegram v. Herdrich*,
530 U.S. 211 (2000) ........................................................................... 39

*Perez-Cruet v. Qualcomm Inc.*,
No. 23-CV-1890-BEN (MMP), 2024 WL 2702207 (S.D. Cal. May 24,
2024), *reconsideration denied*, No. 23-CV-1890-BEN (MMP),
2024 WL 3798391 (S.D. Cal. Aug. 12, 2024) .................................... 48

*Perkins v. United Surgical Partners Int'l, Inc.*,
2024 WL 1574342 (5th Cir. Apr. 11, 2024) ................................31, 32

*Probst v. Eli Lilly & Co.*,
No. 22-cv-1106, 2023 WL 1782611 (S.D. Ind. Feb. 3, 2023) ........... 31

*Rodriguez v. Intuit Inc.*,
    744 F. Supp. 3d 935 (N.D. Cal. 2024).................................................53, 54, 56, 57

*Santomenno v. Transam. Life Ins. Co.*,
    883 F.3d 833 (9th Cir. 2018) ...............................................................39

*Sellers v. Trustees of Coll.*,
    2022 WL 17968685 (D. Mass. Dec. 27, 2022)......................................35

*Schuster v. Swinerton Inc.*,
    2025 WL 1069887 (N.D. Cal. Apr. 8, 2025).........................................29

*Sigetich v. Kroger Co.*,
    No. 21-cv-697, 2023 WL 2431667 (S.D. Ohio Mar. 9, 2023) ...........31

*Singh v. Deloitte LLP*,
    123 F.4th 88 (2d Cir. 2024) ..........................................................1, 30

*Smith v. CommonSpirit Health*,
    37 F.4th 1160 (6th Cir. 2022) .............................................................31

*Stewart v. NextEra Energy, Inc.*,
    Case No. 23-81314, Dkt. 58 (S.D. Fla. Aug. 14, 2025) ....................49

*Terraza v. Safeway Inc.*,
    241 F. Supp. 3d 1057 (N.D. Cal. 2017)...............................................32

*Tibble v. Edison Int'l*,
    575 U.S. 523 (2015).............................................................................19

*Tibble v. Edison Int'l*,
    843 F.3d 1187 (9th Cir. 2016) ......................................................19, 20

*Tolomeo v. R.R. Donnelley & Sons*,
    Case No. 20-CV-7158, 2023 WL 3455301 (N.D. Ill. May 15, 2023)...............26

*Trs. of S. Cal. Bakery Drivers Sec. Fund v. Middleton*,
    474 F.3d 642 (9th Cir. 2007) ...............................................................40

*Walsh v. Allen*,
    2022 WL 256312 (W.D. Ky. Jan. 26, 2022) ......................................11

*White v. Chevron Corp.*,
    752 F. App'x 453 (9th Cir. 2018).........................................................31

*Wright v. JPMorgan Chase & Co*,
    2025 WL 1683642 (C.D. Cal. June 13, 2025)......................................49

*Wright v. Or. Metallurgical Corp.,*
    360 F.3d 1090 (9th Cir. 2004) ...............................................................50, 54, 55

**Statutes and Other Authorities:**

28 U.S.C. § 1291 ...............................................................................................3

28 U.S.C. § 1331 ...............................................................................................3

29 U.S.C. § 1002(34) ........................................................................................9

29 U.S.C. § 1104(a)(1)(A) ...................................................................13, 19, 51

29 U.S.C. § 1104(a)(1)(B) ........................................................................*passim*

29 U.S.C. § 1104(a)(1)(D) ..............................................................................50

29 U.S.C. § 1106(b) .....................................................................................3, 54

29 U.S.C. § 1106(b)(1) .............................................................13, 54, 55, 57

29 U.S.C. § 1109(a) .......................................................................................12

29 U.S.C. § 1132(a)(2) ...................................................................................12

26 C.F.R. § 1.401-0 ........................................................................................47

26 C.F.R. § 1-401-7(a) ..............................................................................47, 51

42 Fed. Reg. 42320 (1977) .............................................................................47

83 Fed. Reg. 34469 (2018) .............................................................................47

88 Fed. Reg. 12282 (2023) ........................................................................47, 48

ERISA § 404 ...................................................................................................50

ERISA § 404(a)(1) ..........................................................................................19

ERISA § 404(a)(1)(A) ................................................................................19, 51

ERISA § 404(a)(1)(B) ................................................................................19, 52

Merriam-Webster's Collegiate Dictionary, 11th Ed. (2003) ........................55

Restatement (Third) of Trusts § 90(c)(3) (2007) ......................................19, 20

Rev. Rul. 67-68, 1967-1 C.B. 86 (1967) .......................................................47

Rev. Rul. 71-313, 1971-2 C.B. 203, 1971 WL 26693 (1971) ..................... 47

Rule 12(b)(6) ...................................................................................................26

**INTRODUCTION**

Appellants alleged in detail how the participants in the Nordstrom Plan paid higher fees for the same commoditized and fungible recordkeeping and plan administrative services compared to participants in numerous comparable plans. In the absence of Ninth Circuit authority, and contrary to recent Ninth Circuit decisions, the district court adopts the minority view of *Singh v. Deloitte LLP*, 123 F.4th 88 (2d Cir. 2024) (1-ER-17-18), which in turn adopted a heightened pleading standard requiring comparison of specific level of services between plans and does not credit Appellants' commodification and fungibility allegations. (*Id.* at 17). Yet, the district court's approach, which improperly incorporates by reference and judicially notes numerous documents and materials outside the pleadings, is inconsistent with the majority of cases in both Circuit Courts and courts within this Circuit to have considered this question of commodification and fungibility of Plan RKA services. Under the appropriate pleading standard, Appellants have set out a plausible breach of the duty of prudence claim for excessive RKA fees.

Appellants also alleged in detail how the participants in the Nordstrom Plan paid far higher fees for the same managed account services provided by Financial Engines than did participants in many other comparable plans. Appellants identified specific plans, the specific rates they paid, why those plans were comparable, and explained in detail how the managed account services provided by Financial Engines

1

were substantially identical across all of those plans and the Nordstrom Plan—the only difference being that the Nordstrom Plan and its participants paid a far higher price for those managed account services. (4-ER-608-614, FAC ¶¶ 135-161). The district court, instead of crediting Appellants' detailed and well-pled factual allegations, substituted its own judgment about what it thought the facts should be based on factual disputes in incorporated documents and based on a website not incorporated. (1-ER-33). In doing so, the district court made numerous errors, even going outside the arguments Appellees made—and then misapprehending the results of its own research.

With regard to retirement plan forfeitures, the Nordstrom Plan Committee breached its fiduciary duties of prudence and loyalty by failing to undertake any reasoned and impartial decision-making process to determine whether using the forfeited funds in the Plan to exclusively reduce the Company's own future contribution expenses was in the best interest of the Plan's participants or was prudent. (4-ER-628-629, FAC ¶ 249). Yet, the district court disagreed and dismissed Appellants' claims because the district court found that the Plan Committee had not acted in a fiduciary matter and because its fiduciary duty of prudence and loyalty claims were impermissibly broad. The district court erred both in stating that the Appellants were not acting in a fiduciary capacity with regard to the challenged allocation of forfeitures and by not taking account of well-pled allegations that

Appellants' claims were limited to holding the Plan Committee responsible for failing to undertake any reasoned and impartial decision-making process to determine whether it should use the forfeited funds in the Plan to reduce the Company's own future contribution expenses. (*Id.*)

Finally, the district court improperly dismissed Appellants' self-dealing claim under 29 U.S.C. § 1106(b) because it is not necessary to have a "transaction" to make out a self-dealing claim under ERISA and even if a transaction was required, none of the cases cited dealt with a transfer of plan assets *for the primary benefit of the employer* as opposed for the benefit of plan participants. Because Appellants have plausibly established these fiduciary breach and prohibited transaction claims, they also have derivatively established failure to monitor claims against Nordstrom and its Board. Accordingly, the district court's order dismissing those claims should be reversed and this case should be remanded for further proceedings.

## JURISDICTIONAL STATEMENT

This is an appeal from the district court's Order of June 23, 2025, (1-ER-4-47), and the Final Judgment of September 9, 2025, in favor of Appellees and against Appellants. (1-ER-2). The district court had jurisdiction pursuant to 28 U.S.C. § 1331. This Court has jurisdiction pursuant to 28 U.S.C. § 1291. Appellants timely appealed the dismissal with prejudice of the forfeiture claims on July 18, 2025,

3

(4-ER-634-636), and then timely appealed the remaining claims after Final Judgment was entered on those claims on September 9, 2025. (App. Dkts. 13.1, 14.1)

## ISSUES PRESENTED

1. Whether Appellants plausibly plead that Appellees breached their duties of prudence and to monitor by establishing that the Nordstrom Plan charged its participants excessive RKA fees compared to other comparable plans receiving the same fungible and commodified services?

2. Whether Appellants plausibly plead that Appellees breached their duties of prudence and to monitor by establishing that the Nordstrom Plan charged its participants excessive managed account fees compared to other comparable plans receiving the same services?

3. Whether Appellants plausibly plead that Appellees breached their fiduciary duties by allocating plan forfeitures exclusively to reduce Nordstrom's Plan contributions instead of reducing participant administrative expenses, without following a prudent process to show that such use of forfeitures was always the most prudent course and in Plan participants' best interests?

4. Whether Appellants plausibly plead that Appellees engaged in self-dealing when it dealt with Plan forfeitures exclusively for its own benefits rather than taking into account the best interests of its Plan participants?

The pertinent statutes are set forth in the Addendum to this brief.

## STATEMENT OF FACTS

Plaintiffs-Appellants Curtis McWashington, Edward M. Meshuris, Emily Sanchez, James Albright, and Cory R. Crouchley ("Appellants") are participants in the Nordstrom 401(k) Plan ("Plan" or "Nordstrom Plan"). (4-ER-582, FAC ¶ 1). The Plan is a defined contribution individual account plan sponsored by Defendant-Appellees Nordstrom, Inc. ("Nordstrom" "the Company") and the Board of Directors of Nordstrom, Inc. ("Board"). (4-ER-583, 584, *id.*, ¶¶ 2, 8). Defendant-Appellee Nordstrom 401(k) Plan Retirement Committee ("Plan Committee") administers the Plan. (4-ER-583, *id.*, ¶ 3). This case concerns the Plan Committee's excessive payment of recordkeeping and administrative ("RKA") and managed account fees to third-party plan service providers and the administration of the Nordstrom Plan's forfeiture provisions. (4-ER-583-584, *id.*, ¶ 7).

## I. BUNDLED RKA FEES

Like all other large 401(k) plans, to administer the Nordstrom Plan, Defendants needed a third party to provide administrative services. The Plan Committee hired Alight, a third-party recordkeeper, to handle plan administration through a bundled service arrangement. (4-ER-590, *id.*, ¶¶ 50–51). The Plan Committee arranged that the Nordstrom Plan's participants would pay for these recordkeeping and administrative services out of their retirement savings in the Plan. (4-ER-592, *id.*, ¶ 59). As relevant here, the services the Nordstrom Plan received

were core administrative services such as recordkeeping, transaction processing, participant communications, compliance testing, and trustee/custodian functions. (4-ER-590-591, *id.*, ¶¶ 54-55). The FAC defines these services as "Bundled RKA services" to facilitate plan-to-plan comparisons. Bundled RKA services are standardized, fungible, and commoditized across providers; differences in service quality among major recordkeepers are immaterial to pricing. (4-ER-591, 595-596, *id.*, ¶¶ 56–58, 74–77). The Bundled RKA services received by the Nordstrom Plan represent standard Bundled RKA services; nothing indicates Nordstrom's plan received unique or customized services (4-ER-592, *id.*, ¶¶ 61–62).

The cost of recordkeeping and administrative ("RKA") services primarily depends on the number of participants, not plan assets; therefore, participants with small or large balances cost the same to service. (4-ER-590, *id.*, ¶¶ 52–53). Consultants typically request "per participant" quotes ("revenue requirement") when comparing recordkeeper bids, aligning with industry RFP practices. (4-ER-597, *id.*, ¶¶ 84-85). Appellants identified numerous comparator plans used in the analysis (e.g., Leidos, Aldi, Fidelity, Deloitte, UPS, and Lowe's) each with similar participant counts and assets, which received essentially the same set of Bundled RKA services. (4-ER-594-595, *id.*, ¶¶ 67–68, 72-73). However, the comparator plans identified in the FAC all paid significantly less for the Bundled RKA services their plans received. (4-ER-602-606, *id.*,115-127).

## II.    MANAGED ACCOUNT FEES

Managed Account ("MA") service providers, like Edelman Financial Engines ("FE"), provide automated account management for 401(k) plan participants, through which participants permit the provider to make asset allocation decisions based on data provided by the participant. (4-ER-608, FAC ¶ 135). The Nordstrom Plan offered MA services through Alight Financial Advisors ("AFA"), a subsidiary of Alight, which was in turn sub-advised by FE. (4-ER-608, *id.*, ¶¶ 137–138). FE's MA services are materially the same whether provided directly or through intermediaries like AFA, Empower, or Vanguard. (4-ER-608, *id.*, ¶ 139). MA services provided by FE to the Nordstrom Plan are highly fungible and commoditized, when compared to MA services provided by FE to other plans. (4-ER-608-611, FAC ¶¶ 139-144, 148- 151). "Unlike Morningstar and Fidelity, Financial Engines provides the same core asset allocation services to all plans for which it acts as the MA service provider," (4-ER-609, FAC ¶ 141), and "plans that use FE all receive the same MA services and methodology which feature the same key drivers of asset allocation risk level." (*Id.*, ¶ 142)

The Nordstrom Plan participants paid significantly higher MA fees compared to participants in other plans who received the same MA services from FE during the Class Period. (4-ER-610, FAC ¶¶ 146-148). Because FE's services are standardized and commoditized across all large plans, fees across similar plans

should be, and typically are, comparable. (*Id.*, ¶ 149). Comparator plans—such as Bristol Myers, Duke Energy, Dell, Cisco, American Airlines, IBM, and AT&T— paid much lower rates, typically ranging from 0.10% to 0.25% of assets managed by FE. (4-ER-610-611, FAC ¶ 150). The average fee among these plans was 18.3 basis points (0.183%). (4-ER-612, FAC ¶ 151). Nordstrom's rate of 60 basis points (0.60%) for most participants was therefore unreasonable, and inconsistent with a prudent fiduciary process. (*Id.*, ¶¶ 152-153), costing participants more than $9 million in excessive fees during the class period. (4-ER-612-613, FAC ¶ 154).

## III. FORFEITURES

The Nordstrom Plan is funded by a combination of wage withholdings by Plan participants and Company matching and non-elective contributions, each of which is deposited into the Nordstrom Plan's trust fund. (4-ER-614, FAC ¶ 162). Nordstrom is obligated to make contributions that match employee contributions dollar for dollar on the first 1% of eligible compensation and 50 cents per dollar on the next 6% of eligible compensation, up to a total of 4% of eligible compensation. (*Id.*, ¶ 163). Upon their deposit into the Plan's trust fund, all participant contributions and Company contributions become assets of the Plan. (*Id.*, ¶ 164).[1] As an individual

---

[1] Contributions become plan assets once they are paid to a plan. *Bos v. Bd. of Trs.,* 795 F.3d 1006, 1010-11 (9th Cir. 2015); *Cline v. Indus. Maint. Eng'g & Cont. Co.,* 200 F.3d 1223, 1234 (9th Cir. 2000).

account, defined contribution retirement plan, the Nordstrom Plan "provides for an individual account for each participant and for benefits solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses, and any forfeiture of accounts of other participants which may be allocated to such participant's account." (*Id.*, ¶ 165) (citing 29 U.S.C. § 1002(34)). Participants are fully vested in their salary deferrals plus actual earnings thereon. (*Id.*, ¶ 166). Vesting in Company contributions is based on years of qualified service and vest fully after two years of service. (*Id.*). Forfeitures are the nonvested portion of a participant's account that is lost upon termination of employment. (*Id.*, ¶ 167).

Plan forfeitures are available under three circumstances: (1) Nordstrom Contributions that were forfeited pursuant to § 8.2 when the participant was terminated for cause ("§ 8.2 Funds"); (ii) nonvested Nordstrom Contributions that are pending forfeiture pursuant to § 8.3 as a result of a participant's severance from employment ("§ 8.3 Funds"); and (iii) unclaimed benefits forfeited pursuant to § 10.8 because the Plan's fiduciary does not know the whereabouts of the participants or beneficiaries to whom such funds are owed ("§ 10.8 Funds"). (3-ER-423, 430-431,442 (Nordstrom Plan §§ 6.5.3, 8.2, 8.3, and 10.8.2)). This case only concerns § 8.3 funds that are available as result of a participant's not-for-cause severance from employment under Plan § 5.1.2. (4-ER-615, FAC, § 170).

9

With regard to § 8.3 forfeitures, Nordstrom's Plan gave the Plan Committee a choice about how to use § 8.3 forfeitures each year. (4-ER-614-615, FAC ¶ 168). In particular, the Plan Committee could allocate the forfeited funds to reduce the Plan's administrative expenses, thereby saving the Participants (who otherwise pay those administrative expenses), or the Plan Committee could elect to use the § 8.3 forfeited funds to offset Nordstrom's own obligation to make Plan contributions. (*Id.).* The 2021 version of the Plan document has two pertinent provisions:

> 6.5 Forfeiture Suspense Account.
>
> ¶ 6.5.3 Allocation of Forfeitures held in the Forfeiture Suspense Account. The forfeiture suspense account will be used first to restore any previously forfeited amounts under Section 10.8.2, ***and then to reduce Company contributions as provided under Section 5.1.2.*** (emphasis added).

(4-ER-615, FAC ¶ 169 (citing 3-ER-423, Plan Doc. § 6.5.3) (emphasis added)).

In turn, the pertinent provision in Section 5 states:

> 5.1 Employer Profit Sharing Contribution.
>
> ¶ 5.1.2 Forfeitures. To the extent not used to restore amounts previously forfeited under Section 10.8.2, forfeitures **under Section 8.3** for the then completed Plan Year *shall be used to reduce the Employer contribution obligations or to pay expenses of Plan administration, as determined by the Retirement Committee in its sole discretion.* (emphasis added).

(*Id.*, ¶ 170) (citing 3-ER-411 (Plan Doc. § 5.1.2) (emphasis added)).

Thus, the combination of Plan Section 6.5.3 and 5.1.2, working in tandem, means that the forfeiture suspense account will be used, after restoring previously forfeited amounts under §10.8.2., to *either* reduce Company contributions *or* pay expenses of Plan administration, as determined by the Retirement Committee *in its sole discretion.* (4-ER-615, FAC ¶ 171) (emphasis added). Unlike other plans,[2] the Plan does not specify which option between reducing employer contribution or paying administrative expenses should take priority. (4-ER-615, FAC §§ 169-170).

From 2018 to 2023, Company non-elective contributions to the Nordstrom Plan were reduced by a total of $23,482,000, as a result of Appellees' reallocation of forfeited funds for the Company's own benefit, and no forfeited funds were used to pay any part of the $61,547,228 in Plan administrative expenses during the same period. (4-ER-615-617, FAC ¶¶ 174-180). Thus, from 2018-2023, Appellees used forfeited funds to reduce the Company's contributions to the Plan, when compounded by Plan returns over the relevant time period, by $25,694,529. (4-ER-617, FAC ¶ 181). Appellees have consistently utilized the forfeited funds in the Plan exclusively for the Company's own benefit, to the detriment of the Plan and its

---

[2] *Compare Naylor v. BAE Sys., Inc.*, 2024 WL 4112322, at *6 (E.D. Va. Sept. 5, 2024) (requiring that forfeitures first be used to offset employer contributions), with *Walsh v. Allen*, 2022 WL 256312, at *3-4 (W.D. Ky. Jan. 26, 2022) (requiring that forfeitures be used to pay plan expenses).

participants, by using forfeited Plan assets solely to reduce Nordstrom's obligation to make contributions to the Nordstrom Plan. (*Id.*, ¶ 185).

## STATEMENT OF THE CASE

Appellants filed suit against Nordstrom, the Board, and the Plan Committee on August 12, 2024. (4-ER-642). On November 1, 2024, Appellants filed their FAC, the operative complaint, against Nordstrom, the Board, and Plan Committee, on behalf of the Plan pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2) seeking to represent a class of participants and beneficiaries of the Plan. (4-ER-582-583, FAC ¶ 1). Appellants alleged that "because of Defendants' fail[ed] to implement a prudent process to control the Plan's Bundled RKA and managed account expenses, and fail[ed] to properly understand and evaluate the amount being paid for those services from all sources despite the express regulatory command to do so, the Plan's participants paid vastly more than what comparable very large retirement plans paid for comparable Bundled RKA and managed account services." (4-ER-584, FAC ¶ 10). Additionally, Appellants alleged "the Defendants imprudently and disloyally failed to use the Plan's forfeitures to reduce the Plan's expenses, and instead used that money to benefit Nordstrom by reducing Nordstrom's obligation to make future benefit contributions to Plan. This conduct also violated the fiduciary prohibited transaction rules against self-dealing by companies." (4-ER-584, FAC ¶ 11).

In all, Appellants alleged eight causes of action: (1) breach of ERISA's duty of prudence in violation of 29 U.S.C. § 1104(a)(1)(B) for charging excessive Bundled RKA fees; (2) breach of ERISA's duty of prudence in violation of 29 U.S.C. 29 U.S.C. § 1104(a)(1)(B) for charging excessive managed account fees; (3) breach of the duty to monitor regarding for charging excessive Bundled RKA fees; (4) breach of the duty to monitor regarding for charging excessive managed account fees; (5) breach of ERISA's duty of loyalty in violation of 29 U.S.C. § 1104(a)(1)(A) for misallocating Plan forfeitures; (6) breach of ERISA's duty of prudence in violation of 29 U.S.C. § 1104(a)(1)(B) for misallocating Plan forfeitures; (7) self-dealing in violation of 29 U.S.C. § 1106(b)(1); and (8) failure to monitor fiduciaries with regard to misallocation of forfeitures. (4-ER-621-631, FAC ¶¶ 202-264). Nordstrom, the Board, and the Committee moved to dismiss the FAC on December 6, 2024. (4-ER-546-581).

After the motion to dismiss had been fully briefed, on June 23, 2025, the district court issued an order dismissing all the RKA and managed account claims with leave to amend, and dismissing all the forfeiture claims with prejudice. (1-ER-4-47). After incorporating by reference and judicial notice a number of documents (1-ER-7-13), the district court concluded with regard to the excessive RKA claim that "when, as here, ERISA plaintiffs rely on self-selected data about alleged comparators, as opposed to industry surveys, independent studies, or the like, . . . ,

13

they must provide sufficient indicia of an apples-to-apples comparison to warrant an inference of imprudence and plausibly state a claim against an ERISA fiduciary. (1-ER-18-31). With regard to the Appellants' excessive managed account claims, the district court similarly found that "[b]ecause plaintiffs have failed to allege facts from which imprudence relating to managed account fees may be plausibly inferred, they have not stated a viable claim for relief." (1-ER-31-35). With regard to Appellants' breach of the duty of loyalty and prudence claims regarding Plan forfeitures, the district court found a lack of fiduciary status, the forfeiture claims were too broad (1-ER-35-44), and the self-dealing claims were missing a "transaction." (1-ER-44-45). The district court derivatively dismissed all the duty to monitor claims. (1-ER-45).

Based on the numerous legal and factual errors in the district court's opinion, Appellants decided not to amend their complaint and asked the district court to enter final judgment so that Appellants could file this appeal. The district court entered final judgment on all claims on September 9, 2025. (1-ER-2-3). Appellants timely filed their appeal on the forfeitures claims on July 18, 2025, (4-ER-634-636), and timely supplemented their appeal of the remaining claims on September 9, 2025. (App. Dkt. 13.1, 14.1).

## SUMMARY OF ARGUMENT

With regard to both incorporation by reference and judicial notice, the district court abused its discretion by reading Ninth Circuit precedent to allow it to decide underlying factual disputes contained in extraneous Nordstrom 5500 Forms, comparator 5500 Forms, and selected *excerpts* from the 5500 Form Instructions. Incorporating and judicially noticing these documents permitted the district court to find that Appellants' allegations were inconsistent and that its comparators were too disparate to be meaningful comparators.

Appellants alleged in detail how the participants in the Nordstrom Plan paid significantly more for a standard package of Bundled RKA services compared to participants in numerous comparable plans. The district court erred by refusing to credit Appellants' well-pled allegations. Moreover, while the district court engaged in a lengthy and convoluted fact-finding process relying on factual disputes in incorporated and noticed documents, many of the district court's conclusions were basic factual errors that could have been avoided had it simply accepted Appellants' well-pled allegations as true.

Appellants also alleged in detail how the participants in the Nordstrom Plan paid far higher fees for the same managed account services provided by FE than did participants in many other comparable plans receiving similar FE managed account services. Appellants identified specific plans, the specific rates they paid, why those

plans were comparable, and explained in detail how the managed account services provided by FE were substantially identical across all of those plans and the Nordstrom Plan—the only difference being that the Nordstrom Plan and its participants paid a far higher price for those managed account services. The district court erred by, instead of crediting Appellants' detailed and well-pled factual allegations, relying on disputed facts in incorporated Plan documents and in relying on an unincorporated website involving the managed account provider. In doing so, the district court made numerous errors, even going outside the arguments Appellees made—and then misapprehending the results of its own research.

With regard to retirement plan forfeitures, plan forfeiture allocations used to pay administrative expenses does not confer a "benefit" on participants and does "maximize pecuniary benefits," as the district court finds. When forfeitures are used to pay administrative expenses, they effectively reduce the cost to the employer, but participants receive no direct or allocable gain. Thus, such forfeitures are not a "benefit" to which participants are not entitled in the sense of a distribution, accrual, or vested right.

Moreover, the plan document entrusts the Nordstrom Plan Committee, "in its sole discretion," to choose between using forfeitures to (i) reduce Company contribution obligations; or (ii) to pay expenses of Plan administration. (4-ER-615, FAC ¶ 170) (citing 3-ER-411 (Nordstrom Plan Section 5.1.2)). As alleged by

Appellants, the Nordstrom Plan Committee failed to undertake any reasoned and impartial decision-making process to determine whether using the forfeited funds in the Plan to exclusively reduce the Company's own future contribution expenses, as opposed to the administrative expenses charged to participant accounts, was in the best interest of the Plan's participants or was prudent. (4-ER-628-629, FAC ¶ 249). This is not to say that using Plan forfeitures to reduce Company contributions is categorically imprudent or disloyal, only that a prudent process should have been followed. Such a process, as plausibly alleged, was lacking here.

The district court also improperly dismissed Appellants' self-dealing claim because the court believed that ERISA's self-dealing prohibition does not bar non-transactional 'dealing' with account assets. First, self-dealing does not require a "transaction," and even if such claims did, precedent cited by the district court dealt with a transfer of plan assets *for the primary benefit of the employer* as opposed for the benefit of plan participants. Such self-dealing by Appellees is not a harmless intra-plan transfer, as the district court suggests, and Appellant plausibly allege that Appellees engaged in prohibited self-dealing with regard to Plan forfeitures.

Finally, because Appellants have plausibly established these fiduciary breach and prohibited transaction claims, they also have derivatively established failure to monitor claims against Nordstrom and its Board.

# ARGUMENT

The Ninth Circuit reviews dismissal for failure to state a claim *de novo*. *Dougherty v. City of Covina*, 654 F.3d 892, 897 (9th Cir. 2011).

## I.   APPELLANTS' BREACH OF FIDUCIARY DUTY CLAIMS REGARDING EXCESSIVE RKA FEES ARE PLAUSIBLE.

"To state a claim for breach of fiduciary duty under ERISA, a plaintiff must allege that (1) the defendant was a fiduciary; and (2) the defendant breached a fiduciary duty; and (3) the plaintiff suffered damages." *Bafford v. Northrop Grumman Corp.*, 994 F.3d 1020, 1026 (9th Cir. 2021). Nordstrom's motions to dismiss the excessive RKA claim only challenged the second element regarding breach of fiduciary duty.

### A.   ERISA Fiduciaries Have an Ongoing Duty to Ensure Plan Expenses are Reasonable

ERISA imposes strict duties of loyalty and prudence upon fiduciaries of retirement plans, like the Plan, that are covered by ERISA. In particular, ERISA provides that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and (A) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan; [and] (B) with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in like capacity and familiar with such matters would use in the conduct of

18

like character and with like aims." ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1)(A), (B).

ERISA's prudence standard is therefore qualified, evaluating a fiduciary's conduct against the standard of "a prudent man acting in like capacity and familiar with such matters." *Id.* And, as such, ERISA's fiduciary duties under have been described as being among the "highest known to the law." *Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996).

The content of ERISA fiduciary's duties is "derived from the common law of trusts." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 416 (2014). Therefore "[i]n determining the contours of an ERISA fiduciary's duty, courts often must look to the law of trusts." *Tibble v. Edison Int'l,* 575 U.S. 523, 528-529 (2015). Under the common law of trusts, fiduciaries may "incur only costs that are reasonable in amount and appropriate to the investment responsibilities of the trusteeship." Restatement (Third) of Trusts § 90(c)(3) (2007).

The obligation to ensure that retirement plan fees are reasonable is at the heart of ERISA fiduciary duties. *See Marshall v. Snyder*, 572 F.2d 894, 897 (2d Cir. 1978) As this Court has explained, "cost-conscious management is fundamental to prudence in the investment function." *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (*en banc*) (quoting Restatement (Third) of Trusts § 90(c)(3), cmt. *b*). More particularly, the duty of prudence includes a continuing duty to monitor

plan expenses and "incur only costs that are reasonable." *Id.* In enforcing the duty of prudence, courts focus on both the procedural and substantive aspects of an ERISA fiduciary's conduct, inquiring whether the fiduciary followed prudent processes and made prudent decisions. *Id.*

"[T]he circumstances surrounding alleged breaches of fiduciary duty may frequently defy particularized identification at the pleading stage." *Concha v. London*, 62 F.3d 1493, 1503 (9th Cir. 1995). Because ERISA plaintiffs often lack information about a fiduciary's decision-making process, *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 822 (8th Cir. 2018), plaintiffs typically satisfy "the pleading bar by alleging enough facts to *'infer ... that the process was flawed.'*" *See Matousek v. MidAmerican Energy Co.*, 51 F.4th 274, 278 (8th Cir. 2022). For claims involving excessive fees, "the way to plausibly plead a claim of this type is to identify similar plans offering the same services for less." *Id.* at 279.

### B. Appellants' RKA Allegations Were Not Inconsistent and the Comparator Plans Were Not Dissimilar.

The district court's conclusion that Appellants' allegations were inconsistent is completely incorrect, and reflects the dangers of district courts substituting their belief about facts for well-pled allegations. The district court also erred when it concluded that—as a matter of law—the Nordstrom Plan was so different from certain of the comparator plans that the information from the other plans was not relevant.

**First.** The district court made several related errors related to trustee services. Plaintiffs alleged that as a matter of industry practice, trustee and custodial services are included within Bundled RKA services. (4-ER-590-591, FAC ¶¶ 50-57). That general industry practice is entirely consistent with how the Defendants administered the Nordstrom Plan—the Nordstrom Plan's disclosures classify the Plan's trustee fees as a recordkeeping and administrative expense, and in fact paid for the trustee and custodial services by paying the recordkeeper (Alight) in the first instance, who in turn paid the trustee, BNYM. (4-ER-592, FAC ¶¶ 59-60, 63-64). The district court was confused by this state of affairs, and felt that the complaint "indicates that Alight both does and does not provide trustee services." (1-ER-19). Not so. The complaint is quite clear that Alight itself provides no trustee services. (4-ER-591-592, FAC ¶¶ 55(k), 64). Instead, as explained above, Alight receives money for the trustee services that others provide. (4-ER-592, FAC ¶¶ 59-60, 63-64). Thus the FAC was not inconsistent, and much of the district court's puzzlement would have been avoided had the district court simply accepted Plaintiffs' well-pled and well-supported factual allegations as true, as it was required to do on a motion to dismiss.

However, based on nothing more than the district court's own belief that trustee and custodial services are not part of Bundled RKA services (either for the Plan or as an industry), the district court determined that none of the administrative fees Plan participants paid for trustee services counted as administrative expenses. (1-ER-14 n.3).

**Second.** The district court compounded its errors about trustee services by taking judicial notice of the absolute truth of certain service codes that the comparators plans' administrators included on their plans' Form 5500 Annual Reports. Based on those codes, the district court concluded that some of the comparator plans used no trustee services at all, because those plans did not list trustee services as a service code. The district court used these codes to conclude that "information about three plans chosen by plaintiffs as comparators, namely the Deloitte, Lowe's, and UPS plans, entirely undermines plaintiffs' assertion that the industry practice is to bundle recordkeeping and trustee services." (1-ER-18-19; 1-ER-26). The district court placed far too much weight on the Form 5500 service codes.

As discovery would further develop, service and compensation codes are self-reported and their definitions are confused and overlapping, which has led the Third Circuit (among others) to caution against assuming that they are accurate or consistently applied plan-to-plan on a motion to dismiss:

> The different service codes do not undermine the [plaintiffs'] comparisons because they apparently overlap. All of the plans list either 'Recordkeeping fees,' 'Recordkeeping and information management (computing, tabulating, data processing),' or both. These two codes seem similar . . . . At this stage, the record does not reveal the codes' precise meanings, nor whether all plans define the codes consistently. But given that all the plans received some portion of an overlapping constellation of recordkeeping services, the comparisons help nudge the [Appellants'] claims across the line from possible to plausible.

*Mator*, 102 F.4th at 186.

The same reasoning applies here with equal force. Service codes are interesting and provide some information, but are not in themselves sufficiently reliable to overcome well-pled allegations that all of the comparator plans paid for Bundled RKA services including trustee or custodial services. The 5500 Form service codes do not cast any doubt on Appellants' allegations that "all the plans received some portion of an overlapping constellation of recordkeeping services." *Id.*; (4-ER-594-595, FAC ¶¶ 67-68).

The district court is, of course, free to disagree with Appellants' allegation as a *factual* matter at summary judgment or trial that trustee fees are not Bundled RKA services or that other plans somehow did not have a trustee, but the district court erred by selecting Appellees' interpretation. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (finding that a court does not weigh evidence, evaluate witness credibility, or consider the likelihood that a plaintiff will prevail at trial on a motion to dismiss).[3] In all, the district court should have credited Appellants' well-pled,

---

[3] The district court also makes factual conclusions about the Deloitte plan having a similar approach to the FMR Plan in the *Moitoso* case with Fidelity, and thereby maintains the Deloitte Plan is not comparable to the Nordstrom Plan. (1-ER-27-28). In other words, the district court digs through documents outside the pleadings, makes factually-contested conclusions about those documents, and then chastises Appellants for not including those "unfavorable provisions" in their FAC. Needless to say, not only is this approach completely inconsistent with any notion regarding motion to dismiss standards, but it is unlikely that many complaints would survive this factually-based motion to dismiss analysis of incorporated documents.

correct, and coherent allegations that the Nordstrom Plan paid for trust and custodial services as part of its Bundled RKA services package, just like all the comparator plans.[4]

**Third**. The district court erred in finding that "plaintiffs have offered two different and inconsistent sets of data for the bundled RKA expenses paid by the Nordstrom Plan." (1-ER-21). As an initial matter, the district court does not seem to grasp that the numbers reported in paragraphs 65 and 115 of the FAC are based on *different documents* and provided for different purposes. The numbers in paragraph 65 of the FAC come from Schedule C of the Nordstrom Plan 5500 Reports, and were included in the complaint to show that the Nordstrom Plan received the same suite of Bundled RKA services that the comparator plans received. (4-ER-593-594, FAC ¶¶ 65-66). However, Form 5500 Schedule C numbers are *not* utilized to make fee comparisons between the plans. Rather, Appellants rely on participant fee disclosures under Section 404a-5, as well as audited financial statements attached to

---

[4] Similarly, the district court simply ignored Appellants' comparator plan, Lowe's, which had fees much lower than the Nordstrom Plan. (1-ER-19-20 & n. 5). Without basis, it made the factual finding that Lowe's was an outlier and should not be compared to the Nordstrom Plan. (1-ER-24). Not only does this conclusion about Lowe's comparability strain credulity, but any finding involving weighing disputed evidence is completely inappropriate on a motion to dismiss. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (finding that a court does not weigh evidence, evaluate witness credibility, or consider the likelihood that a plaintiff will prevail at trial on a motion to dismiss).

the 5500 Forms for such comparison, as courts have found that Section 404a-5 numbers are more reliable than 5500 numbers.[5]

Similarly, in comparing the plans over multiple years and single years, the district court improperly conflates the allegations in paragraphs 65 and 66 with the allegations in paragraphs 115 and 116, thereby wrongly calculating the fee comparison between the plans and coming to erroneous conclusions. (1-ER-22-25 & notes 7-11) (multi-year data); (1-ER-25-31 & notes 12-13) (single-year data). So, there is nothing inconsistent in Appellants' allegations concerning trustee services in paragraphs 65 and 66, on the one hand, and allegations concerning RKA fee comparisons in paragraphs 115 and 116, on the other hand. Moreover, to the extent there are inconsistencies between numbers reported on the two forms, these are inconsistencies caused by *how Appellees reported this information* and is further evidence of how they imprudently managed the operation of the Nordstrom Plan.[6]

---

[5] A number of courts have found that fee comparisons based on Section 404a-5 fee disclosures are preferable to those based on 5500 Form numbers. *See, e.g., Dionicio v. U.S. Bancorp,* No. 23-CV-0026 (PJS/DLM), 2024 WL 1216519 (D. Minn. Mar. 21, 2024) ("[P]laintiffs plaintiffs rely solely on the § 404(a)(5) participant-disclosure forms to calculate the costs of RKA services for both the Plan and the comparator plans . . . . [A] comparison of payments made for 'basic recordkeeping services' (as disclosed by § 404(a)(5) forms) by two similarly-sized plans could provide the basis of a plausible claim for relief.").

[6] Finally, to the extent there are disagreements about calculation of fees regarding comparators, this is a dispute over the components of the plaintiff's calculations of the comparator's fees and the source documents that led to those calculations and that is exactly the kind of factual dispute that is not appropriate for a motion to

Finally, the district court emphasizes potential flaws in the fee comparison calculations made by Appellants, (1-ER-22-28), but even if such errors exist (which they do not), those errors are not fatal because the FAC as a whole states a plausible claim. The Third Circuit in *Mator* addressed this same issue and noted that, at the motion-to-dismiss stage, plaintiffs will necessarily be limited to calculations based on publicly available data. *See Mator*, 102 F.4th at 181. Accordingly, even while "allegations [that] are based on incorrect arithmetic ... are not well-pled[,]" courts must still "tak[e] into account all of the well-pled facts." *Id.* at 190. Therefore, this Court should not uphold the dismissal of Appellants' RKA fees claim because, "even taking [calculation] problems into account, ... the comparators are sufficiently similar to the Plan, to state a claim." *Id.* Appellants compiled a number smaller plans with fewer participants that also charged lower Bundled RKA services fees per participant than the Plan, which – given Appellants' allegations about the commodified and fungible nature of the RKA services market and the leverage that plan sponsors managing significant assets have to negotiate fees – also supports their claims. *See Krutchen*, 2024 WL 3518308, at *4. As a result, viewing the FAC as a whole makes clear Appellants sufficiently allege that the Nordstrom Plan Committee violated their ERISA duties by paying Bundled RKA services fees significantly

---

dismiss under Rule 12(b)(6). *See Tolomeo v. R.R. Donnelley & Sons*, Case No. 20-CV-7158, 2023 WL 3455301 at *4 (N.D. Ill. May 15, 2023).

higher than they would have if they acted with necessary "care, skill, prudence, and diligence[.]" 29 U.S.C. § 1104(a)(1)(B).

These comparisons therefore help nudge the Appellants' claims across the line from possible to plausible.

**Fourth.** The district court maintains that "the Deloitte, Fidelity, and Leidos plans are too different in size from the Nordstrom Plan to permit an apples-to-apples comparison . . . Each of the alleged comparators has more than twice the assets of the Nordstrom Plan." (1-ER-28-29). This conclusion flies in the face of other cases that have considered what makes a plan of comparable size with regard to participants and assets, concluding generally there is no magical number making comparisons sufficiently close. *See Dionicio*, 2024 WL 1216519, at *3 (D. Minn. Mar. 21, 2024) ("[T]here is no one-size-fits-all approach for determining whether a particular plan provides a meaningful benchmark.") *Dionicio* also notes that when you have a very large plan like the Nordstrom Plan, "it [is] easy for defendants to complain about potential comparators. Even if a comparator has similar total assets, defendants will complain that it has too many or too few participants, and even if a comparator has similar total participants, defendants will complain that it has too many or too few assets . . . . Under defendants' approach, plaintiffs suing exceptionally large or exceptionally small plans would face a nearly insurmountable pleading hurdles." *Dionicio,* 2024 WL 1216519, at *3. The pleading hurdles here

27

applied by the district court have approved insurmountable even given the relative similarity of the comparator plans that Appellants selected.[7]

For all these reasons, this Court should reverse the district court on Appellants' breach of the fiduciary prudence claims with regard to plausible allegations involving excessive Bundled RKA fees.

### C. The District Court Erred by Holding that Plaintiffs' Well-Pled Apples-to-Apples Comparisons to Other Very Large 401(k) Plans with the Same Bundled RKA Services Are Insufficient to State a Claim for Relief

As set forth above, Plaintiffs' have presented well-pled and detailed allegations showing through apples-to-apples comparisons with other similar plans that the Nordstrom Plan overpaid for essentially the same suite of Bundled RKA services. The district court erred by substituting its own speculations for those well-pled allegations. However, the district court also committed the legal error of applying a heightened pleading standard to Plaintiffs' claims, a standard that most courts have rejected and that this Court has never adopted. The district court is correct that the Ninth Circuit has not yet addressed the pleading standards for a claim

---

[7] The district court also directly contradicts Appellants' well-pled allegations that participant size is more significant when it comes to what plan recordkeepers charge for services, (4-ER-590, FAC ¶ 52), because "the cost of providing recordkeeping services to a participant with a $100,000 account balance is the same for a participant with $1,000 in her retirement account." (4-ER-590, FAC ¶ 53). Instead of accepting these well-pleaded allegations as true as a court must on a motion to dismiss, the district court errs when it concludes the opposite. (1-ER-29).

asserting that an ERISA fiduciary breached its duty of prudence with respect to bundled RKA expenses." (1-ER-15), and "[t]he level of detail required to 'nudg[e] an inference of imprudence from possible to plausible," has varied from court to court and case to case." (1-ER-17) (citing *Matousek*, 51 F.4th at 278).

Other Circuits and district courts to consider the issue have held that "every possible alternative explanation for an ERISA fiduciary's conduct need not be ruled out at the pleadings stage." *Hughes v. Nw. Univ.*, 63 F.4th 615, 629 (7th Cir. 2023) ("*Hughes II*"); *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 597 (8th Cir. 2009); *Mator v. Wesco Distribution*, 102 F.4th 172, 184 (3d Cir. 2024). For instance, "[i]n two different cases, the Northern District of California did not conduct an 'apples to apples' assessment of the plan at issue and its alleged comparators, indicating that such rigor is not required by the Ninth Circuit." (1-ER-17) (citing *Schuster v. Swinerton Inc.*, 2025 WL 1069887, at *5 (N.D. Cal. Apr. 8, 2025); *Nagy v. CEP Am., LLC* 2024 WL 2808648, at *4 (N.D. Cal. May 30, 2024)). Indeed, *Nagy* expressly states that to survive a motion to dismiss, ERISA plaintiffs need not provide "granular, micro-level 'apples to apples' comparisons, based on data to which they may not yet have access." *See Nagy*, 2024 WL 2808648, at *4 (citing *Johnson v. Fujitsu Tech. & Bus. of Am., Inc.*, 250 F. Supp. 3d 460, 467 (N.D. Cal. 2017)).

Yet, in the absence of Ninth Circuit authority, and contrary to recent Ninth Circuit decisions, the district court adopts the minority view of *Singh v. Deloitte LLP*, 123 F.4th 88 (2d Cir. 2024), (1-ER-17-18), which applied a heightened pleading standard requiring comparison of specific level of services between plans and does not credit Appellants' commodification and fungibility allegations. (1-ER-17). The district court's approach is inconsistent with the majority of both Circuit Courts and courts within this Circuit to have considered this question of commodification and fungibility of Plan RKA services. *See Hughes II*, 63 F.4th at 632 (finding that plaintiffs stated a claim for breach of fiduciary duty based on allegations that "recordkeeping services are fungible and the market for them is highly competitive" because fungibility satisfied the need to allege "the quality or type of recordkeeping services the comparator plans provided");[8] *Mator*, 102 F.4th at 186 (taking as true the allegation that the RKA services market is competitive, and therefore different recordkeepers must provide similar services); *Krutchen v. Ricoh USA, Inc.,* 2024 WL 3518308, at *3 (3d Cir. July 24, 2024) ("Contrary to Defendants' claims, the Complaint's allegations that the RK&A services market is commodified and competitive are not mere 'conclusions' that we must reject. We

---

[8] *Hughes II* clarified and narrowed the holding of *Albert v. Oshkosh Corp.*, 47 F.4th 570 (7th Cir. 2022), and yet the district court only cites *Albert* for the Seventh Circuit case on this issue. (1-ER-15).

follow several courts in concluding that it is a well pled allegation that must be taken as true at this stage of the case. While Defendants contend that there are varying types of RK&A services and the charges logically diverge, this is a factual claim that must be determined at a later stage in the case.") (citing *Mator*, 102 F.4th at 186; *Braden*, 588 F.3d at 595)[9]; *Hughes II,* 63 F.4th at 63; *Perkins v. United Surgical Partners Int'l, Inc.*, 2024 WL 1574342, *5 (5th Cir. Apr. 11, 2024). ("The Defendants . . . rely on other circuit courts' dismissals of duty of prudence claims predicated on recordkeeping costs. But those cases are distinguishable because the plaintiffs either compared recordkeeping costs for their plan to industry-wide averages or failed to compare their plans with similarly sized plans or did not offer a comparison between plans offering similar recordkeeping services.") (distinguishing *Matney v. Barrick Gold of N. Am.,* 80 F.4th 1136, 1155-58 (10th Cir. 2023); *Matousek*, 51 F.4th at 279–80; *Albert,* 47 F.4th at 579–80; *Smith v. CommonSpirit Health*, 37 F.4th 1160, 1169 (6th Cir. 2022); *White v. Chevron Corp.*, 752 F. App'x 453, 455 (9th Cir. 2018)).

Like *Hughes II*, *Mator*, and the cases cited above, Appellants maintain that Bundled RKA services provided to the Nordstrom Plan were commodified and

---

[9] In other words, there is significant contrary Circuit case authority that disagrees with the district court's conclusion, which is only based on two district court decisions from outside this Circuit. *See Probst v. Eli Lilly & Co.*, No. 22-cv-1106, 2023 WL 1782611, at *11 (S.D. Ind. Feb. 3, 2023); *Sigetich v. Kroger Co.*, No. 21-cv-697, 2023 WL 2431667, at *4 n.2 (S.D. Ohio Mar. 9, 2023).

fungible in comparison to the RKA services provided to other plans and "offering similar recordkeeping services" for less. (4-ER-591, FAC ¶ 56). As the FAC clarifies, "[t]his does not mean all plans have identical RKA services, only that plans are provided the same set of Bundled RKA services, and can pick and choose among them like an all-you-can-eat buffet." (4-ER-591, FAC ¶ 57). As in *Perkins*, because Appellants "compare the Plan's recordkeeping costs with the costs for similar recordkeeping services provided to a similar number of plan participants," *Perkins*, 2024 WL 1574342, *5, that is all that is necessary under the appropriate pleading standard for their Bundled RKA claims to survive Appellees' motion to dismiss. Indeed, there is *not a single Ninth Circuit* case, before this one, that had adopted the heightened pleading standard of *Singh* which requires a comparison of each service received by each plan, and yet the district court adopts that insurmountable standard here,[10] and improperly focuses on documents outside of pleadings to refute Appellants' well-pled contentions regarding trustee services. (1-ER-19).[11] In all,

---

[10] The district court, inconsistent with what most courts that have considered the question, also suggests that Appellants would have been better off if they used industry averages studies instead of direct plan comparisons. (1-ER-18). Yet, the consensus view is that of *Perkins*, which states that reliance of industry averages is insufficient. *See Perkins,* 2024 WL 1574342, *5.

[11] With regard to incorporation by reference, the district court erred by reading *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988 (9th Cir. 2018), to allow it to decide underlying factual disputes contained in the Nordstrom 5500 Forms, the comparator 5500 Forms, and in accepting only Appellees' selected *excerpts* from the 5500 Form Instructions. (1-ER-10). Yet, *Kohja* emphasized, "[a]lthough incorporation by

Appellants' claims are detailed, and the allegations in the complaint explain in considerable depth the nature of the recordkeeping services (which the complaint defines as "Bundled RKA services" to allow the court to make an apples-to-apples comparison with other plans) the Nordstrom Plan received. The complaint also includes detailed allegations regarding the Bundled RKA services received by comparable plans, and compares the lower prices those plans paid compared to the much higher price the Nordstrom Plan paid.[12]

---

reference generally permits courts to accept the truth of matters asserted in incorporated documents, *we reiterate that it is improper to do so only to resolve factual disputes against the plaintiff's well-pled allegations in the complaint.*" *Id.* at 1014 (emphasis added). "The incorporation-by-reference doctrine does not override the fundamental rule that courts must interpret the allegations and factual disputes in favor of the plaintiff at the pleading stage." *Id.* at 1014. As a far as judicial notice, a court may properly take judicial notice of disputed documents themselves, *see Terraza v. Safeway Inc.,* 241 F. Supp. 3d 1057, 1067 (N.D. Cal. 2017), but a court may *not* take judicial notice of any disputed facts in such documents. *See Khoja*, 899 F.3d at 999. The district court abused its discretion by accepting Appellees' invitation to engage in an analysis over disputed facts in the Nordstrom and comparator 5500 Forms and should have not taken judicial notice of them, as "there is a reasonable dispute as to what [these] documents establish." *See Khoja*, 899 F.3d at 1001.

[12] On this point, the decision of the district court in *Dionicio v. U.S. Bancorp*, 2024 WL 1216519 (D. Minn. Mar. 21, 2024), is instructive. Under material similar circumstances, *Dionicio* denied the motion to dismiss, finding that "Plaintiffs [made] just such a comparison, bolstered by additional allegations regarding the fungibility and commodification of RKA services," and "[t]hese allegations make it unnecessary to compare individual services to individual services, because all recordkeepers provide the same bundled services, and the total price of the bundle remains the same no matter which of the individual services within the bundle a mega plan chooses to use." *See Dionicio*, 2024 WL 1216519, at *2-*4 (citing *Hughes II,* 63 F.4th at 632).

## II. APPELLANTS' BREACH OF FIDUCIARY DUTY CLAIM REGARDING EXCESSIVE MANAGED ACCOUNTS FEES IS PLAUSIBLE.

As with Appellants' excessive RKA fees claim, in their motion to dismiss Appellees did not challenge fiduciary status with respect to Appellants' excessive managed account fees claim. Appellees' challenged only whether they breached their fiduciary duties. In this regard, Appellants alleged in detail that the Nordstrom Plan participants overpaid significantly, by many times, the typical rate comparable plans paid for the same managed account services provided by the same managed account advisory, Edelman Financial Engines ("FE"). (4-ER-583-584, 608-614, 624-625, FAC ¶¶ 7, 135-161, 220-230).

With regard to these excessive fee allegations, the Ninth Circuit *does not* apply a "meaningful benchmark" standard or any other heightened pleasing standard for these types of ERISA claims. Under Ninth Circuit precedent, Appellants have sufficiently alleged that Appellees paid excessive fees (60 basis point versus an average of 18.3 basis point), (4-ER-612, FAC, ¶ 153), for Plan MA services from FE in comparison to other plans receiving materially similar, fungible MA services from FE. (4-ER-610, FAC, ¶¶ 148-149). Taking all of these allegations into account, this Court should conclude here that Appellants have pled "sufficient factual allegations to state a plausible claim against [Appellees] for breach of the duty of

prudence as a result of 'imprudent managed account fees.'" *Sellers v. Trustees of Coll.*, 2022 WL 17968685, at \*14 (D. Mass. Dec. 27, 2022).

As in *Sellers,* Appellants provided specific allegations about the fungibility and commoditization of managed account services provided by FE to the Nordstrom Plan. (4-ER-608-611, FAC, ¶¶ 139-144, 148- 151). In this vein, Appellants allege that "Financial Engines provides a MA strategy distinctive from its two main competitors, Morningstar and Fidelity," (4-ER-608-609, FAC ¶ 140), "[u]nlike Morningstar and Fidelity, Financial Engines provides the same core asset allocation services to all plans for which it acts as the MA service provider," (4-ER-609, FAC ¶ 141), and "plans that use FE all receive the same MA services and methodology which feature the same key drivers of asset allocation risk level…." (4-ER-609, FAC ¶ 142).Those allegations are well-founded and well-pled.  Appellants claims should not have been dismissed. *See Hughes II,* 63 F.4th at 633 (ERISA claims not dismissed where plan participants "point to other institutions that had successfully consolidated and reduced fees" and allege "that the market is competitive with equally capable recordkeepers who can provide comparable services for less.").

The district court, however, refused to credit Appellants' allegations, and instead substituted its own opinions about the relevant facts, and dismissed the claims related to the managed account fees. (1-ER-30-34). Most significantly, the district court states that "information concerning the professional investment

management services that AFA performs, and they do not allege that Edelman's practices, if any, as a sub-advisor are similar to its methods as a managed account service provider. Moreover, plaintiffs have not explained the relationship between Edelman and the sub-advisor actually hired by AFA (i.e., FEA)." (1-ER-29-30). Yet, Appellants expressly allege that "[t]he Nordstrom Plan provided a managed account (MA) service through Alight's wholly-owned subsidiary, Alight Financial Advisors ("AFA")," (1-ER-608, FAC ¶ 137), "[i]n turn, AFA is sub-advised by Edelman Financial Engines ("FE"), (1-ER-608, FAC ¶ 138), and "[t]he MA services provided by Financial Engines to plans are materially the same whether provided directly by Financial Engines or whether they sub-advise through another entity like AFA, Empower, or Vanguard." (1-ER-608, FAC ¶ 139). In short, Appellants have (1) provided information concerning the professional investment management services that AFA performs through FE (1-ER-609, FAC ¶ 142); (2) allege that Edelman's practices as a sub-advisor are materially similar to its methods as a managed account service provider; and (3) have explained the relationship between Edelman and AFA.[13] The district court had no authority to discount Appellants' well-pled

---

[13] It appears that the district court is confused when it states: that "plaintiffs have not explained the relationship between Edelman *and the sub-advisor actually hired by AFA (i.e., FEA)*." (1-ER-29-30). Appellants never refer to an "FEA", and as Appellants allege, FE *is* the subadvisor hired by AFA. (1-ER-608, FAC ¶ 138) ("In turn, AFA is sub-advised by Edelman Financial Engines ("FE")). (1-ER-608, FAC ¶ 138). It appears the district court's confusion stems from its review of the Nordstrom 2023 Fee Disclosure and the different terminology used therein. (1-ER-

allegations at the pleading stage. Courts must "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *See Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005).

Second, the district court refused to credit Appellants' allegations about the fees participants in other plans paid for exactly the same FE managed account services. The district court claimed, with no support, that the allegations in the FAC show that "AFA charges more than Edelman for more and/or different work." (1-ER-34). The district court does not explain how it reached that conclusion that AFA provides any services that are not provided by FE, or why it credited that supposition instead of the allegations in the FAC that the managed account services Appellants received were no different from those received by participants in other plans serviced by FE—except for their price.

"Rule 8 does not require a plaintiff to plead facts tending to rebut all possible lawful explanation for a defendant's conduct." *Braden,* 588 F.3d at 596. Not only does the district court require Appellants to plead such facts here, but the district court simply ignored or rejected outright Appellants' well-pled and detailed

---

32) ("The Nordstrom Plan, however, refers to AFA's sub-advisor as Financial Engines Advisors L.L.C. ("FEA").) (citing 2-ER-197 (Nordstrom Plan Annual Fee Disclosure Statement (Oct. 2023)). Of course, the two entities are one in the same. Even if there were a dispute over this fact, this is again a factual dispute inappropriate for decision based on a document incorporated by refence and based on a website not incorporated at all. (https://www.edelmanfinancialengines.com/about-us/). (1-ER-32-33); *Khoja*, 899 F.3d at 1014.

allegations that the plan overpaid for managed account services and instead chose to credit strained interpretations based on factual dispute in an incorporated Plan fee disclosure and unincorporated website. Under these circumstances, the Court should find the district court erred and that Appellants have plausibly alleged that Appellees, in violation of their duty of prudence, paid excessive managed account fees to AFA, subadvised by FE.

## III. APPELLANTS' BREACH OF FIDUCIARY DUTY CLAIMS REGARDING MISALLOCATION OF PLAN FORFEITURES ARE PLAUSIBLE.

As discussed above, Nordstrom and its Board sponsor the Nordstrom Plan for the purpose of *exclusively* providing retirement benefits to its employees. The Plan forfeitures, which are plan assets, should have set up a fiduciary process, pursuant to the relevant Plan provisions, to consider in what proportion the Plan Committee should allocate forfeitures to pay Plan administrative expenses and employer matching contributions to insure that the Committee was serving the best interests of Plan participants. Yet, the Nordstrom Plan Committee, reflexively ended up using all of those forfeitures for the Company's benefit. In short, by reducing their employers contribution obligations with forfeitures, "Defendants received a benefit while participants simply received that which they would have received anyway, and remain[ed] on the hook for paying their share of Plan expenses." *See Buescher v. North American Lighting, Inc.*, -- F.Supp.3d ----, 2025 WL 1927503, at *8 (C.D. Ill.

38

June 30, 2025). Such conduct violates the Plan Committee's fiduciary duties of loyalty and prudence to Appellants and other Plan participants. Yet, the district court disagreed and dismissed Appellants' claims for three reasons, starting from the premise that "Plaintiffs construe §§ 5.1.2 and 6.5.3 of the 2021 Restatement to confer on the Committee discretion to use funds in the 'forfeiture suspense account' to either reduce Nordstrom's contributions to the Plan or pay administrative expenses, [which is] . . . "an overly simplistic interpretation." (1-ER- 38) (citing 4-ER-615, FAC ¶ 171)).

## A. The Plan Committee Was Clearly Acting in a Fiduciary, Not Settlor Capacity, In Deciding How to Allocate Section § 8.2 Plan Forfeitures, the Only Forfeitures Challenged in the FAC.

In determining whether a party's conduct is governed by ERISA's fiduciary duties, "the central inquiry is whether the party was acting as an ERISA fiduciary 'when taking the action subject to complaint.'" *Santomenno v. Transam. Life Ins. Co.*, 883 F.3d 833, 838 (9th Cir. 2018) (quoting *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000). The "action subject to complaint" here is Nordstrom's annual decisions to use all of the *§ 8.3 forfeitures* to reduce its Plan contributions rather than defray any of the Plan's administrative expenses. (4-ER-615, FAC ¶ 168). Settlor decisions "concern[] the composition or design of the plan itself" whereas fiduciary decisions "consist of such actions as the administration of the plan's assets." *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 444 (1999). Thus, while Nordstrom acted as a settlor

when it designed the Plan to require that "[t]he forfeiture suspense account will be used first to restore any previously forfeited amounts under Section 10.8.2, and then to reduce Company contributions as provided under Section 5.1.2," (4-ER-615, FAC ¶ 169), it acted as a fiduciary when it subsequently directed that the Plan Committee used "to reduce the Employer contribution obligations or to pay expenses of Plan administration, as determined by the Retirement Committee in its sole discretion." (4-ER-615, FAC ¶ 170); *Trs. of S. Cal. Bakery Drivers Sec. Fund v. Middleton*, 474 F.3d 642, 646 (9th Cir. 2007) ("[A]n entity that takes 'actions in regard to the[] management and disposition [of plan assets] must be judged against ERISA's fiduciary standards'") (quoting *John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank*, 510 U.S. 86, 106 (1993)).

Nevertheless, the district court found the allocation of so-called "§ 8.2 Funds," which were the Nordstrom Contributions that were forfeited by participants who were terminated for cause, were "dictated by the Plan's terms, and such action is therefore taken in the capacity of a 'settlor,' not a fiduciary, of the Plan." (1-ER-38) (citing *Dimou v. Thermo Fisher Sci. Inc.*, No. 23-CV-1732, 2024 WL 4508450, at *7 (S.D. Cal. Sept. 19, 2024); *Naylor v. BAE Sys., Inc.*, No. 24-cv-536, 2024 WL 4112322 (E.D. Va. Sept. 5, 2024)). The district court justifies its convoluted reading of the Plan by maintaining that "plaintiffs' argument presupposes that the amounts in the 'forfeiture suspense account' will never exceed the aggregate of benefits to be

restored pursuant to § 10.8.2 and Nordstrom's required contributions to the Plan; such speculation does not justify disregarding the plain language of § 6.5.3."

The cases cited by the district court are inapplicable to this case. *Dimou*'s holding on fiduciary status is consistent with Appellants' fiduciary arguments regarding *§ 8.3 Funds*, the challenged forfeiture funds here: "[A]lthough the decision to include a plan term setting forth various permissible uses for forfeitures is a settlor function, implementing that decision is a fiduciary function. Accordingly, the Court concludes that Plaintiff's claims implicate a fiduciary decision." *See Dimou*, 2024 WL 4508450, at *8. The same true is here, as Appellants allege that "[t]he combination of ¶¶ 6.5.3 and 5.1.2, working in tandem, means that the forfeiture suspense account will be used, after restoring previously forfeited amounts [under Section 10.8], to **either** reduce Company contributions **or** pay expenses of Plan administration, as determined by the Retirement Committee **in its sole discretion.** (emphasis added). (4-ER-615, FAC ¶ 171).

Nor does *Naylor* provide any guidance because the Plan language in that case *mandatorily* required through "shall" language that the challenged forfeitures be used to reduce employer contributions before paying administrative expenses. *See Naylor,* 2024 WL 4112322, at *4 ("First, forfeitures 'shall' be used to restore the employer contribution accounts for Plan members who terminated their employment

with BAE before they were fully vested, but were subsequently reemployed within the next five years . . . Second, forfeitures 'shall' be used to reduce future employer contributions."). Here, on the other hand, the challenged forfeiture allocations involving Section 8.3 funds involve the combination of Sections 6.5.3 and 5.1.2, working in tandem, to provide the Plan Committee "sole discretion" to determine how the forfeiture suspense account will be used. (4-ER-615, FAC ¶ 171).

Although the district courts attempts to make this case about irrelevant Plan forfeiture funds under § 8.2 and § 10.8, (1-ER-39) ("[P]laintiffs did not differentiate between § 8.2, § 8.3, and § 10.8 Funds"), Appellants are only challenging § 8.3 forfeitures in this case, because it is only those forfeitures which are referred to expressly in § 5.1.2 and only those forfeitures which the Plan Committee has the discretion to allocate. (4-ER-615, FAC ¶¶ 169-171). In the end, the district court concedes as much: "The Committee's discretion under § 5.1.2 is limited to § 8.3 Funds," and thus, this ends up not being a reason at all for denying Appellants' plausible allegations that the Plan Committee improperly used its discretion in allocating the challenged forfeiture funds under Section 8.3 solely to reduce company contributions. So, as in *Dimou*, the Court here should conclude "that [Appellants'] claims implicate a fiduciary decision." *See Dimou*, 2024 WL 4508450, at *8.

**B.** **The District Court Erred by Concluding that Appellants' Well-Pled Allegations Are Implausibly Broad Like Those in *Hutchins I* and Similar Cases.**

Both the district court's second and third reasons for finding Appellant's breach of fiduciary duty claims implausible essentially come to down to the same argument the other courts credited in *Hutchins v. HP Inc.*, 737 F. Supp. 3d 851, 860 (N.D. Cal. 2024) ("*Hutchins I*") and *Hutchins v. HP Inc.*, 2025 WL 404594, at *1 (N.D. Cal. Feb. 5, 2025), *appeal pending*, No. 25-826 (9th Cir.) ("*Hutchins II*"). (1-ER-39) ("Under plaintiffs' theory, funds in the 'forfeiture suspense account' could never be used to reduce Nordstrom's contributions to the Plan because doing so would constitute a breach of fiduciary duty. Plaintiffs' interpretation improperly renders a portion of § 6.5.3 superfluous."); (1-ER-40-41) ("Plaintiffs' proposition, namely that re-allocating 'forfeiture suspense account' funds to reduce Nordstrom's contributions was per se imprudent, runs contrary to the principle that 'the content of the duty of prudence turns on 'the circumstances . . . prevailing' at the time the fiduciary acts" and 'the appropriate inquiry will necessarily be context specific.'") (quoting *Hutchins I*, 737 F. Supp. 3d at 862; *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014) (citing 29 U.S.C. § 1104(a)(1)(B)); *see also Hutchins II*, 2025 WL 404594, at *5 ("[T]he breadth of Plaintiff's theory continues to make it implausible.").

The district court completely mis-read Appellants well-pled allegations with regard to the forfeiture allegations and wrongly characterizes those allegations like those in *Hutchins* as "a swing for the fences." (1-ER-41) (citing *Hutchins I*, 737 F. Supp. 3d at 856)). Indeed, this case has allegations that differ critically from *Hutchins I* and *II* and *Dimou*. Instead, this case closely resembles *McManus v. Clorox Co.*, 2025 WL 732087 (N.D. Cal. Mar. 3, 2025) ("*McManus II*"). Although *McManus v. Clorox Co.*, 2024 WL 4944363 (N.D. Cal. Nov. 1, 2024) ("*McManus I*"), is largely similar to *Hutchins I* as far as the claim being "impermissibly broad," *McManus I*, 2024 WL 4944363, at *6, *McManus II* comes out differently than *Hutchins II*, with the motion to dismiss being denied. *McManus II*, 2025 WL 732087, at *6. The difference in outcome, which applies equally to this case, is that there are specific and contextual allegations that no longer makes these claim "impermissibly broad."

The court in *McManus II* noted that the plaintiff had added "more specific allegations" in the amended complaint that "[f]or each year of the putative class period, Clorox had sufficient cash and equivalents on hand to satisfy its contribution obligations to the Plan. Nevertheless, throughout that period, Defendants consistently based the decision of how to allocate forfeitures solely on Clorox's own self-interests and failed to consider the interests of the Plan and its participants." *McManus II*, 2025 WL 732087, at *2. The plaintiff also alleged that "[a]t the

discretion of Defendants, forfeited nonvested accounts in their fiduciary capacity, forfeitures may be used to either pay the Plan's expenses or reduce the Company's contributions to the Plan. Which of these options would be in the best interests of participants depends on the particular facts and circumstances present at the time of the allocation decision." *Id.*

The *McManus II* court denied the defendants' motion to dismiss, finding that the plaintiff's new factual allegations were sufficient to plausibly state a claim that the defendants had breached their fiduciary duties. *Id.* at *4. Here, as in *McManus II* and *Buescher*, Appellants specifically allege that the decision to allocate forfeitures toward employers matching contributions can in some circumstances align with the interests of Plan participants. (4-ER-628-629, FAC ¶ 249). More specifically, Appellants allege that "Defendant Plan Committee failed to undertake any reasoned and impartial decision-making process to determine whether using the forfeited funds in the Plan to reduce the Company's own future contribution expenses, as opposed to the administrative expenses charged to participant accounts, was in the best interest of the Plan's participants or was prudent, and failed to consider whether participants would be better served by another use of these Plan assets after considering all relevant factors." (*Id.*) In other words, and as could be further developed in discovery, "[i]n the event of potential financial hardship, allocation of forfeitures toward the employer's . . . contributions is surely a better result for Plan

45

participants than outright termination of the Plan." *Buescher*, 2025 WL 1927503, at *10. Appellant have therefore "*expressly* alleged that the proper allocation of forfeitures is a context-dependent inquiry, and that allocation toward offsetting employer contributions may at least sometimes be in the best interests of participants. While the circumstances he describes may ultimately be narrow, the Amended Complaint simply cannot be construed as advancing a claim that offsetting employer contributions *never* aligns with the duty of loyalty," as the district court assumes. *See id.* As in *Buescher* and *McManus II*, Appellants' allegations concerning what would be prudent and in the best interests of participants depends on the particular facts and circumstances present at the time of the allocation decision is a crucial distinction that the district court missed in finding that this case was similar to *Hutchins* and *Dimou*.

The district court also erred by tying its flawed reasoning to various, long-existing IRC provisions and Treasury regulations (or proposed regulations). (1-ER-42). The fact that the IRS historically permitted forfeitures to be used to reduce employer contributions is irrelevant because this is a *tax rule*, not a *fiduciary standard* that goes to ERISA's fiduciary and prohibited transaction rules. *See Edes v. Verizon Communications, Inc.*, 417 F.3d 133, 143 (1st Cir. 2005) ("Even if Plaintiffs are right that the GTE ERISA plans violate this [tax] regulation, Plaintiffs themselves recognize that § 1.410(b)–4(b) is not incorporated into ERISA. Hence a

46

violation of this regulation cannot be a violation of ERISA through incorporation."). The same is true with regard to Appellees' use of IRS Code Section 1-401-7(a), Rev. Ruling 71-313, 83 Fed. Reg. 34469, 88 Fed. Reg. 12282. None of them have been incorporated into ERISA and "[h]ence a violation of this regulation cannot be a violation of ERISA through incorporation." *See id*. The Fifth Circuit in *Abraham v. Exxon Corp.*, 85 F.3d 1126 (5th Cir.1996), observed: "[t]he [Treasury] regulations purport to do no more than determine whether a plan is a qualified tax plan. Failure to meet the requirements of those regulations results in the loss of a beneficial tax status." *Id.* at 1131. The same is true here: the Treasury regulations and proposed rules only go to whether a plan is a qualified tax plan, and do not create substantive defenses for Appellees.

Even if the Court is not suggesting that there is a private right of action under the tax provisions, it is at least maintaining that these tax laws provide guidance on how to interpret fiduciary provisions. However, the IRS has clarified that § 1.401-7(a), among other regulations including Rev. Rul. 67-68, 1967-1 C.B. 86 (1967) and Rev. Ruling 71-313, 1971-2 C.B. 203, 1971 WL 26693 (1971), "reflect the provisions of" the Code "*prior to* amendment by" ERISA. *See* 26 C.F.R. § 1.401-0 (emphasis added); 42 Fed. Reg. 42320 (1977). Moreover, Definitions of Qualified Matching Contributions and Qualified Nonelective Contributions (QNECs), 83 Fed. Reg. 34469, 34470 (July 20, 2018) (codified at 26 C.F.R. pt. 1) does not apply

47

because it dealt with using forfeitures to offset QNECs (not the employer matching contributions at issue here) and proposed new regulations, Use of Forfeitures in Qualified Retirement Plans, 88 Fed. Reg. 12282, 12285 (2023), cited by the district court, are just proposed. *See Perez-Cruet v. Qualcomm Inc.*, No. 23-CV-1890-BEN (MMP), 2024 WL 2702207 (S.D. Cal. May 24, 2024), *reconsideration denied*, No. 23-CV-1890-BEN (MMP), 2024 WL 3798391 (S.D. Cal. Aug. 12, 2024) ("[T]he rule has not yet been adopted and has no force of law."). In any event, and to quote *Buescher*, the district court's "contention that allocating forfeiture in this manner is permissible, in a general sense, does not demonstrate that that decision comported with the duty of loyalty in this particular case." *Buescher*, 2025 WL 1927503, at *11. Appellants are "not asserting a categorical rule that employers must pay plan expenses. Nor would [their] claim effectuate such a result. Far more narrowly, [they are] merely arguing that where, as here, the allocation of forfeitures is committed to the discretion of fiduciaries, that decision must be made in accordance with ERISA's fiduciary directives." *See id*.

Furthermore, the district court states correctly that "[t]he appropriate way to construe the 2021 Restatement is to give effect to both § 6.5.3 and § 5.1.2." (1-ER-39-40) (citing *Liao v. Fisher Asset Mgmt.*, LLC, No. 24-cv-2036, 2024 WL 4351869, at *4 (N.D. Cal. Sept. 30, 2024)). But the district court engages in speculation and gives only one plausible explanation to the Plan forfeiture language when it

maintains that "plaintiffs' argument presupposes that the amounts in the 'forfeiture suspense account' will never exceed the aggregate of benefits to be restored pursuant to § 10.8.2 and Nordstrom's required contributions to the Plan; *such speculation* does not justify disregarding the plain language of § 6.5.3. (1-ER-39-40) (emphasis added). Yet, the "plain language of § 6.5.3, through § 5.1.2, gives the Plan Committee sole discretion to choose how to allocate the § 8.3 forfeitures (4-ER-615, FAC ¶ 172) ("To read this Plan language to require the Retirement Committee to always use forfeitures to reduce Company contributions would render the 'provided under Section 5.1.2' language in ¶ 6.5.3 superfluous.). Moreover, the Plan interpretation alleged by Appellants is not speculation but validated by the factual allegations that in *every year of the Class Period* the amounts in the 'forfeiture suspense account' *have in fact* never exceeded the aggregate of benefits to be restored pursuant to § 10.8.2 and Nordstrom's required contributions to the Plan. (4-ER-617, FAC ¶ 180). "Simply put, it is far from clear that [this] Court is dealing with a situation where the 'only reasonable interpretation' of the Plan is the interpretation advanced by [the district court]." *See Stewart v. NextEra Energy, Inc.*, Case No. 23-81314, Dkt. 58 at 16 (S.D. Fla. Aug. 14, 2025) (quoting *Wright v. JPMorgan Chase & Co*, 2025 WL 1683642, at *4 (C.D. Cal. June 13, 2025)). Appellants have thus alleged plausible allegations that Appellees have failed to comply with the forfeiture provisions of the Nordstrom Plan.

Moreover, unlike in *Wright v. Or. Metallurgical Corp.,* 360 F.3d 1090 (9th Cir. 2004), Appellants are not arguing that ERISA's fiduciary duties required Nordstrom to deviate from the Plan's terms. Whereas the plaintiffs in *Wright* argued that ERISA's fiduciary duties required the company to permit them to sell more employer securities "in violation of the Plan's express terms," *id.* at 1097, here Appellants argue only that Nordstrom should have used forfeitures to pay Plan expenses, an option the Plan expressly allows. (4-ER-615, FAC ¶ 170). Thus, unlike *Wright,* there is no tension here between the duty "to maximize retirement savings for participants," *Dudenhoeffer*, 573 U.S. at 420, and the duty to follow the Plan's terms as written, 29 U.S.C. § 1104(a)(1)(D). *Wright*'s statement that the former duty is not "exclusive" of the latter duty is not implicated here because the duties are in harmony, not competition. Thus, such forfeitures neither constitute "additional benefits" nor do they "maximize pecuniary benefits" for Plan participants, as the district court found. (1-ER-42 n.28). This Court's admonition that ERISA § 404, concerning how a fiduciary shall conduct itself, "creates no exclusive duty of maximizing pecuniary benefits," *Foltz v. U.S. News & World Report, Inc.*, 865 F.2d 364, 373 (D.C. Cir. 1989), does not apply to this instance where participants are seeking payment of administrative "expenses," as expressly permitted by the Nordstrom Plan, and are not seeking entitlement to any additional "benefits."

Indeed, when forfeitures are used pay administrative expenses, they effectively reduce the cost to the employer, but participants receive no direct or allocable gain. Thus, it's not a "benefit" in the sense of a distribution, accrual, or vested right. Courts and DOL guidance (e.g., DOL Adv. Op. 93-14A) have recognized that such forfeitures are plan assets until properly applied for a permissible purpose—but their use to pay reasonable administrative expenses does not confer a "benefit" to any participant. Thus, paying reasonable plan administrative expenses are not considered "benefits" to participants under ERISA § 404(a)(1)(A) or Treas. Reg. § 1.401-7(a), but instead constitute permissible administrative applications of plan assets. With these crucial distinctions front and center, and contrary to the district court's reasoning for its decision below, Appellants have stated a claim for breach of fiduciary duties of loyalty and prudence.

**First.** With regard to the duty of loyalty claim, and based on *McManus II* and *Buescher*, this Court should find that Appellants have plausibly alleged a breach of the Plan Committee's fiduciary duty of loyalty with regard to allocation of Plan forfeitures. ERISA requires that fiduciary duties be carried out "solely in the interest of the participants and beneficiaries" and "for the exclusive purpose of "defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A). Appellants have plausibly alleged that the Plan Committee was not acting "solely in the interest of the participants and beneficiaries" when it elected to use Section 8.3

51

forfeitures to solely reduce its employer matching contributions, without considering the best interests of Plan participants, thus providing a benefit to Nordstrom while ensuring that Plan participants would be responsible for Plan administrative expenses. (4-ER-617, FAC ¶¶ 184-185). As discussed in detail above, Appellants allow for the possibility that an offset of employer contributions may sometimes also be to the ultimate benefit of Plan participants and beneficiaries. (4-ER-628-629, FAC ¶ 249). However, Appellants also allege that that was not the case here. 4-ER-617, FAC ¶ 185) ("Defendants have consistently utilized the forfeited funds in the Plan exclusively for the Company's own benefit, to the detriment of the Plan and its participants, by using these Plan assets solely to reduce Nordstrom's obligation to making matching contributions to the Plan."). Accordingly, this Court should reverse the district court's decision on Appellant's fiduciary duty of loyalty based on misallocation of Plan forfeitures and permit this claim to proceed into discovery.

**Second.** With regard to the duty of prudence claim, this Court should also deny Appellees' motion to dismiss Appellants' breach of the fiduciary duty of prudence claim. In this regard, Appellants allege that the Plan Committee breached its fiduciary duty of prudence by utilizing an imprudent, conflicted, and flawed process in determining how forfeitures would be allocated. (4-ER-628-629, FAC ¶ 249). ERISA mandates that fiduciaries discharge their duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man

acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims[.]" 29 U.S.C. § 1104(a)(1)(B). "Because the content of the duty of prudence turns on the circumstances prevailing at the time the fiduciary acts, the appropriate inquiry will necessarily be context specific." *Dudenhoeffer*, 573 U.S. at 425.

As in *Buescher*, Appellants have alleged that the "Plan Committee failed to undertake any reasoned and impartial decision-making process to determine whether using the forfeited funds in the Plan to reduce the Company's own future contribution expenses, as opposed to the administrative expenses charged to participant accounts, was in the best interest of the Plan's participants." (4-ER-628-629, FAC ¶ 249). Indeed, the district court approvingly cited these exact allegations in *Rodriguez v. Intuit Inc.*, 744 F. Supp. 3d 935 (N.D. Cal. 2024), when it stated that "[t]he plaintiff in *Rodriguez* further asserted that, not only did her employer ignore the terms of the plan document at issue, it also failed to engage in "a 'reasoned and impartial decision-making process' considering 'all relevant factors' before determining how to use the forfeited funds." (1-ER-43) (citing *Rodriguez*, 744 F. Supp. 3d at 945). Given the exact same allegations as in this case, the district court then notes that "[t]he *Rodriguez* Court concluded that the plaintiff had pleaded specific facts stating a plausible claim, which distinguished her from the *Hutchins* plaintiff, who had 'opened with a swing for the fences.'" (1-ER-43) (citing *Rodriguez*, 744 F. Supp. 3d at 945 & n.3). In short,

just as in *Rodriguez*, the district court should have taken Appellants' allegations as true at this stage of the proceedings, *see Buescher*, 2025 WL 1927503, at *11, and found that Appellants had pleaded specific facts stating a plausible claim for breach of the duty of prudence.

## IV. APPELLANTS' BREACH OF FIDUCIARY PROHIBITED TRANSACTION CLAIMS REGARDING MISALLOCATION OF PLAN FORFEITURES ARE PLAUSIBLE.

Appellants invoke 29 U.S.C. §1106(b), which prohibits a plan fiduciary from "deal[ing] with the assets of the plan in his own interest or for his own account." (4-ER-617, FAC ¶ 183). By allocating forfeitures toward offsetting employer contributions, and saving Nordstrom millions of dollars in Company Plan contributions, the Plan Committee dealt with the assets of the Plan in their own interest and for their own account. (*Id.*). Yet, the district court improperly dismissed Appellants' self-dealing claim because the court believed that ERISA's self-dealing prohibition does not bar non-transactional 'dealing' with account assets. (1-ER-44) (citing *Hutchins II*, 767 F. Supp. 3d at 928–29; *Lockheed Corp. v. Spink*, 517 U.S. 882 (1996); *Wright*, 360 F.3d 1090).

First, self-dealing under 29 U.S.C.§ 1106(b)(1) is not limited to instances involving "transactions." On its face, § 1106(b)(1) applies when fiduciaries "deal with" plan assets in their own interests. "[T]he dictionary definition of 'deal' when used in conjunction with 'with' is broad." *McMaken v. GreatBanc Tr. Co.*, 2019 WL

1468157, at *7 (N.D. Ill. Apr. 3, 2019). "Specifically, it means to 'take action with regard to someone or something.'" *Id.* (quoting Merriam-Webster's Collegiate Dictionary, 11th Ed. (2003)). Consistent with the dictionary definition of the term "deal with," this Court has stated that a fiduciary violates § 1106(b)(1) when it "uses the assets of a plan for its own benefit." *Friend v. Sanwa Bank Cal.*, 35 F.3d 466, 470 (9th Cir. 1994). Caselaw elucidates that fiduciaries can violate § 1106(b)(1) without engaging in a transaction with the plan. For instance, in *Patelco Credit Union v. Sahni*, 262 F.3d 897 (9th Cir. 2001), the plan administrator misappropriated benefits checks from the plan's insurance provider. The administrator did not engage in any commercial bargain with the plan; he simply took for himself money that belonged to the plan. Notwithstanding the lack of any transaction, this Court held that the administrator engaged in "'prohibited self-dealing' that was 'in violation of § 1106(b)(1).'" *Id.* at 911.

Even if this section requires a transaction, neither *Lockheed Corp. v. Spink*, 517 U.S. 882 (1996), nor *Wright*, 360 F.3d 1090, dealt with a transfer of plan assets *for the primary benefit of the employer* as opposed for the benefit of plan participants.. The Plan Committee's decision to use Plan forfeiture allocation solely to reduce employer Plan contributions is a "transaction" between the Plan Committee and Nordstrom itself, insofar as Nordstrom benefitted from the Plan Committee's decision to use Plan forfeitures to reduce Company Plan contributions and thus, allowed

Nordstrom to save money by not having to take additional funds out of its general revenues. (4-ER-618, FAC ¶¶ 186-187). Under these circumstances, Plan forfeitures are no longer being used solely for the benefit of participants, but instead to relieve the employer of a financial obligation. *See Rodriguez*, 2024 WL 3755367, at *10. That is not a neutral "intra-plan transfer"—it is a use of plan assets for the benefit of a party in interest, the employer, and it also amounts to a type of prohibited fiduciary self-dealing. A true intra-plan transfer is a reallocation of plan assets among participant accounts with no benefit to the employer.

The district court is therefore incorrect that Nordstrom's use of forfeitures for its own benefits is an instance where "the forfeited funds have not been withdrawn from the Plan, but rather redistributed among participants' accounts." (1-ER-45). That reasoning skips over the fact that because of the Plan Committee's conduct with regard to allocating Plan forfeitures, Nordstrom does not have to withdraw money from its own general revenue and "Defendants received a benefit while participants simply received that which they would have received anyway, and remain[ed] on the hook for paying their share of Plan expenses." *See Buescher,* 2025 WL 1927503, at *8. Nor is it clear how, according to the district court, a permitted use of plan assets to pay administrative expenses in any way "raises more concern about potential injury to the Plan than the conduct challenged by plaintiffs." (1-ER-45). There is simply no evidence that if the forfeitures would have been used to pay Plan

56

administrative expenses that there could be "potential injury to the Plan" by allocating forfeitures to pay the Plan recordkeeper.

Thus, a fiduciary prohibited transaction has taken place because Appellees engaged in self-dealing with plan assets to benefit Nordstrom, and such a practice is not a harmless intra-plan transfer as the district court suggests. *Accord Rodriguez*, 744 F. Supp. 3d at 949 ("Intuit's reallocation of undisputed plan assets to reduce its own matching contribution . . . was . . . 'dealing with' plan assets for the purposes of § 1106(b)(1))."). Appellants therefore have plausibly alleged that Appellees engaged in prohibited transactions with Plan forfeitures by benefitting themselves and dealing with their own accounts.

## V. NORDSTROM DERIVATIVELY VIOLATED ITS DUTY TO MONITOR.

Nordstrom itself had a duty to monitor the Plan Committee with regard to excessive RKA fees, excessive managed account fees, and allocation of Plan forfeitures, and breached those duties by allowing the violations in the other counts. Because the allegations of breach of the fiduciary duties of prudence and loyalty, as well as for engaging in fiduciary prohibited transactions, state a plausible claim, Appellants' "derivative claim that [Appellees] violated the duty to monitor also states a plausible claim for relief, and survives the motion to dismiss." *See Bracalente v. Cisco Systems*, 2023 WL 5184138, at *83-*84 (N.D. Cal. Aug. 11,

2023). As such, the district court's decision to dismiss Appellant's duty to monitor claims should be reversed.

## CONCLUSION

Appellants respectfully requests that this Court reverse the district court's order dismissing Appellants' excessive RKA fee claim, excessive managed account fee claim, and breach of fiduciary duty and self-dealing claims with regard to misallocation of plan forfeitures, and remand to the district court with instructions to conduct further proceedings consistent with this Court's order.

Dated: October 31, 2025                **WALCHESKE & LUZI, LLC**

By: */s* Paul M. Secunda
Paul M. Secunda

**SCHNEIDER WALLACE COTTRELL KIM LLP**

By: */s James A. Bloom*
James A. Bloom

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form17instructions.pdf

**9th Cir. Case Number(s)** | 25-4613

The undersigned attorney or self-represented party states the following:

(●) I am unaware of any related cases currently pending in this court.

( ) I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

( ) I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature** | s/ Paul M. Secunda | **Date** | Oct 31, 2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 17** *New 12/01/2018*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)**  25-4613

I am the attorney or self-represented party.

**This brief contains**  13,944  **words,** including  0  words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.

☐ a party or parties are filing a single brief in response to multiple briefs.

☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [                    ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**  s/ Paul M. Secunda  **Date**  10/31/2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**  *Rev. 12/01/22*

# CERTIFICATE OF SERVICE
## When All Case Participants are Registered for the
## Appellate CM/ECF System

I hereby certify that on (date) | Oct 31, 2025 | , I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Signature | s/ Paul M. Secunda

*************************************************************************

# CERTIFICATE OF SERVICE
## When Not All Case Participants are Registered for the
## Appellate CM/ECF System

I hereby certify that on (date) |                | , I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participants:

Signature |

# ADDENDUM

## TABLE OF CONTENTS

I. Pertinent Statutes ........................................................................ ADD-1

    ERISA Section 3(21)(A), 29 U.S.C § 1002(21)(A) ............................ ADD-1

    ERISA Section 404(a), 29 U.S.C. § 1104(a) (Fiduciary Duties) ......... ADD-1

    ERISA Section 406(b), 29 U.S.C. § 1106(b) (Fiduciary Prohibited
    Transactions) .................................................................................. ADD-2

II. Pertinent Regulations ................................................................ ADD-2

    Use of Forfeitures in Qualified Retirement Plans, 88 FR 12282-01,
    12283-12284 (Feb. 27, 2023) (Proposed) ..................................... ADD-2

    Treasury Regulation § 1.401-7(a), 26 C.F.R. § 1.401-7(a),
    Forfeitures under a qualified pension plan .................................... ADD-3

    U.S. Dep't of Labor, Advisory Op. No. 93-14A, 1993 WL 188473, at
    *4 (May 5, 1993) ........................................................................... ADD-3

    Definitions of Qualified Matching Contributions and Qualified
    Nonelective Contributions (QNECs), 83 Fed. Reg. 34469, 34470
    (July 20, 2018) .............................................................................. ADD-4

    Treasury Regulation § 1.401-0, 26 C.F.R. § 1.401–0 Scope and
    definitions .................................................................................... ADD-4

Pursuant to Federal Rule of Appellate Procedure 28(f), Appellants set out the relevant parts of statutes, rules, regulations, and other relevant authorities, in this Addendum. Pursuant to Ninth Circuit Local Rule 28-2.7, this Addendum to Appellants' Opening Brief sets forth verbatim the pertinent statutes, regulations, and rules, with appropriate citation.

## I.    Pertinent Statutes

### ERISA Section 3(21)(A), 29 U.S.C § 1002(21)(A)

**(21)(A)** Except as otherwise provided in subparagraph (B), a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan. Such term includes any person designated under section 1105(c)(1)(B) of this title.

### ERISA Section 404(a), 29 U.S.C. § 1104(a) (Fiduciary Duties)

**(a) Prudent man standard of care**
**(1)** Subject to sections 1103(c) and (d), 1342, and 1344 of this title, a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and--
**(A)** for the exclusive purpose of:
**(i)** providing benefits to participants and their beneficiaries; and
**(ii)** defraying reasonable expenses of administering the plan;
**(B)** with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;
**(C)** by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and

**(D)** in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III.

**ERISA Section 406(b), 29 U.S.C. § 1106(b) (Fiduciary Prohibited Transactions)**

**(b) Transactions between plan and fiduciary**
A fiduciary with respect to a plan shall not--
**(1)** deal with the assets of the plan in his own interest or for his own account,
**(2)** in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or
**(3)** receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

## II.   Pertinent Regulations

**Use of Forfeitures in Qualified Retirement Plans, 88 FR 12282-01, 12283-12284 (Feb. 27, 2023) (Proposed)**

*Use of Forfeitures in Defined Contribution Plans*

Consistent with changes made by TRA 86 providing uniform rules for the use of forfeitures in defined contribution plans (as described in the Conference Report), the proposed regulations would clarify that forfeitures arising in any defined contribution plan (including in a money purchase pension plan) may be used for one or more of the following purposes, as specified in the plan: (1) to pay plan administrative expenses, (2) to reduce employer contributions under the plan, or (3) to increase benefits in other participants' accounts in accordance with plan terms.[FN5] The use of forfeitures to reduce employer contributions includes the restoration of inadvertent benefit overpayments and the restoration of conditionally forfeited participant accounts that might otherwise require additional employer contributions, for example, the restoration of accounts conditionally forfeited under § 1.411(a)-7(d) (relating to certain distributions and cash-outs of accrued benefits).

Timing for Use of Forfeitures in a Defined Contribution Plan

The proposed regulations would generally require that plan administrators use forfeitures no later than 12 months after the close of the plan year in which the

forfeitures are incurred. This deadline is intended to simplify administration by providing a single deadline for the use of forfeitures that applies for all types of defined contribution plans and to alleviate administrative burdens that may arise in using or allocating forfeitures if forfeitures are incurred late in a plan year. The deadline in the proposed regulations is similar to the deadline under § 1.401(k)-2(b)(2)(v) for a section 401(k) plan to correct excess contributions by making corrective distributions, which is 12 months after the close of the plan year in which the excess contributions arise. The proposed regulations would not affect generally applicable deadlines related to the timing of contributions and allocations under a plan, such as the deadline for correcting excess contributions to avoid excise taxes under section 4979 as set forth in § 1.401(k)-2(b)(5)(i).

Proposed Applicability Date

These regulations are proposed to apply for plan years beginning on or after January 1, 2024. Thus, for example, the deadline for the use of defined contribution plan forfeitures incurred in a plan year beginning during 2024 will be 12 months after the end of that plan year.

**Treasury Regulation § 1.401-7(a), 26 C.F.R. § 1.401-7(a), Forfeitures under a qualified pension plan**

In the case of a trust forming a part of a qualified pension plan, the plan must expressly provide that *forfeitures arising from severance of employment, death, or for any other reason, must not be applied to increase the benefits any employee would otherwise receive under the plan* at any time prior to the termination of the plan or the complete discontinuance of employer contributions thereunder. *The amounts so forfeited must be used as soon as possible to reduce the employer's contributions under the plan.*

**U.S. Dep't of Labor, Advisory Op. No. 93-14A, 1993 WL 188473, at \*4 (May 5, 1993)**

With respect to your first question, it is the position of the Department of Labor (the Department) that, in situations outside the scope of the plan assets-plan investments regulation (29 C.F.R. 2510.3-101), the assets of a plan generally are to be identified on the basis of ordinary notions of property rights under non-ERISA law. In general, the assets of a welfare plan would include any property, tangible or intangible, in which the plan has a beneficial ownership interest. The identification of plan assets

would therefore include consideration of any contract or other legal instrument involving the plan, as well as the actions and representations of the parties involved.

Plan assets manifestly include any property held in trust on behalf of the plan. The Plan's assets would thus encompass all property held in the Policy Trust established on behalf of the Plan. This would include any contributions to the Policy Trust, any earnings on the contributions, the Group Policy itself, any reserves under the Group Policy, and any retrospective rate credits declared under the Group Policy.

**Definitions of Qualified Matching Contributions and Qualified Nonelective Contributions (QNECs), 83 Fed. Reg. 34469, 34470 (July 20, 2018)**

Explanation of Provisions

This document contains final regulations that amend the definitions of QMACs and QNECs to provide that employer contributions to a plan are QMACs or QNECs if they satisfy applicable nonforfeitability requirements and distribution limitations at the time they are allocated to participants' accounts. Accordingly, these regulations permit forfeitures of prior contributions to be used to fund QMACs and QNECs.

**Treasury Regulation § 1.401-0, 26 C.F.R. § 1.401–0 Scope and definitions.**

Currentness

**(a)** **In general.** Sections 1.401 through 1.401–14 (inclusive) reflect the provisions of section 401 prior to amendment by the Employee Retirement Income Security Act of 1974. The sections following § 1.401–14 and preceding § 1.402(a)–1 (hereafter referred to in this section as the "Post–ERISA Regulations") reflect the provisions of section 401 after amendment by such Act.